UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

GOLDEN STAR, INC.,                                    :
Plan Administrator of the Golden Star        :
Administrative Associates' 401(k) Plan and  :
Golden Star Bargaining Associates' 401(k) Plan,  :    CIVIL ACTION NO. _____
On Behalf of Itself and All Others           :
Similarly Situated,                          :
                                             :    CLASS ACTION COMPLAINT
                            Plaintiff,       :
                                             :
v.                                           :    CLASS ACTION
                                             :    JURY TRIAL
MASS MUTUAL LIFE INSURANCE CO.,              :
                                             :
                            Defendant.       :

Plaintiff, Golden Star, Inc. ("Plaintiff" or "GSI"), by and through its undersigned counsel,

in support of this Complaint, hereby pleads and avers as follows:

## I.    INTRODUCTION

1.      Mass Mutual (defined below) has entered into revenue sharing agreements and

similar arrangements ("revenue sharing contracts" or "participation agreements") with various

mutual funds, affiliates of mutual funds, mutual fund advisors, investment advisors and sub-

advisors, investment funds, including collective trusts, and other investment advisors,

instruments or vehicles (collectively, "mutual funds"), pursuant to which Mass Mutual receives

revenue sharing payments (which amount to kickbacks) for its own benefit from these mutual

funds in violation of, *inter alia*, the prohibited transaction rules of the Employee Retirement

Income Security Act ("ERISA"), 29 U.S.C. §§1001 *et seq.* (*i.e.*, ERISA §§ 404 and 406(b), 29

U.S.C. §§ 1104 and 1106(b)), as well as ERISA's fiduciary rules (*i.e.*, ERISA §§ 404(a)(1)(A)

and (B), 29 U.S.C. §§ 1104(a)(1)(A) and (B)).

2.      The kickback payments at issue are essentially part of a pay-to-play scheme in which Mass Mutual receives payments from mutual funds in the form of 12b-1 fees, administration fees, service fees, sub-transfer agent fees and/or similar fees (the "revenue sharing payments") in return for providing the mutual funds with access to its retirement plan customers, including its 401(k) plan customers.

3.      Mass Mutual uses its ownership and control over separate accounts in which its retirement plan customers' investments are placed to negotiate for the receipt of these revenue sharing payments from mutual funds, and the revenue sharing payments have the effect of increasing the expense ratios of the mutual funds, which expenses are deducted directly from the assets of the separate accounts.

4.      The revenue sharing payments are based, in whole or in part, on a percentage of the retirement plans' investments in a mutual fund that are delivered to it by Mass Mutual and/or based on the magnitude of the investments by such retirement plans in the mutual fund.

5.      While the revenue sharing payments are often internally described by service providers, such as Mass Mutual, as "services fees" and reimbursement for expenses incurred in providing services for, to, or on behalf of the mutual funds, the amount of the revenue sharing payments bears absolutely no relationship to the cost or value of any such services.

6.      The services provided by Mass Mutual that may incidentally benefit mutual funds (beyond pure and simple access to retirement plan customers -- referred to sometimes as pay-to-play, shelf-space or kickback arrangements) are actually services that Mass Mutual has historically provided to its retirement plan customers as a necessary part of its business, in return for fees directly collected by it from such customers, and these fees generally did not change as a

result of Mass Mutual's receipt of the revenue sharing kickbacks from the mutual funds and were not reduced in a manner that corresponds with the amount of revenue sharing kickbacks received.

7.      Mass Mutual's receipt of the revenue sharing payments at issue violates ERISA's prohibited transaction and fiduciary duty rules and should not be countenanced, since the receipt of such payments places Mass Mutual in a conflicted position in which the interests of its retirement plan customers can be and are sacrificed in the interest of Mass Mutual earning greater profits through the receipt of revenue sharing payments.

8.      As explained below, Mass Mutual also has engaged in acts of self-dealing with respect to the retirement assets of the Plans and the Class held in the Separate Accounts (defined below) and Fixed Account (defined below) and, in so doing, also has otherwise violated the prohibited transaction rules of ERISA, as well as ERISA's fiduciary rules.

9.      This is an action for equitable relief and damages under ERISA in which Plaintiff seeks to recover for the benefit of its 401(k) plans and all other similarly situated retirement plans and entities (collectively, the "Plans"), also known as employee pension benefit plans under ERISA Section 3(2)(A), 29 U.S.C. § 1002(2)(A) that are subject to Internal Revenue Code Sections 401(a) and 401(k), the revenue sharing payments and other compensation that Mass Mutual improperly received.

10.     Plaintiff brings this action on its own behalf and on behalf of all those similarly situated Plans under ERISA §§ 409(a) and 502(a)(2) and (g), 29 U.S.C. §§ 1109(a) and 1132(a)(2) and (g), to recover the following relief:

•      A declaratory judgment holding that the acts of Defendant described herein violate ERISA and applicable law;

- A permanent injunction against Defendant prohibiting the practices described herein;

- Disgorgement and/or restitution of all the revenue sharing payments and other compensation improperly received by Mass Mutual, or, alternatively, the profits earned by Mass Mutual in connection with its receipt of such revenue sharing payments and other unlawful compensation;

- Compensatory damages;

- Attorneys' fees, costs and other recoverable expenses of litigation; and

- Such other and additional legal or equitable relief that the Court deems appropriate and just under all of the circumstances.

## II.   THE PARTIES

11.     Plaintiff is the Plan Administrator of the Golden Star Administrative Associates' 401(k) Plan and the Golden Star Bargaining Associates' 401(k) Plan (individually and collectively, the "GSI Plan" or the "Plan").  In that capacity, GSI is a fiduciary of the Plan.  Both Plaintiff and the Plan are located at 4770 N. Belleview, Ste. 209, Kansas City, Missouri 64116. All of Plaintiff's administrative offices, including its principal place of business, are located in Kansas City, Missouri.

12.     Defendant, Mass Mutual Life Insurance Co. ("Mass Mutual" or "Mass Mutual Financial Group" or "Defendant"), is a business entity with its headquarters and principal place of business located at 1295 State Street, Springfield, Massachusetts 01111.  Mass Mutual is a fiduciary of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

## III.   JURISDICTION AND VENUE

13.     Plaintiff seeks relief on behalf of the GSI Plan and all other similarly situated plans (the "Plans") pursuant to ERISA's civil enforcement remedies with respect to fiduciaries

and other interested parties and, specifically, under ERISA Section 409, 29 U.S.C. § 1109 and 29 U.S.C. § 1132.

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA Section 502(e)(1)(2), 29 U.S.C. § 1132(e)(1)(2).

15.     Venue is proper in this judicial district pursuant to ERISA Section 502(e)(2), 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391, because Mass Mutual maintains its headquarters and principal place of business in Springfield, Massachusetts.

16.     At all pertinent times, Mass Mutual has conducted its retirement business and the retirement business of all other Mass Mutual affiliates and entities from its offices in this judicial district in Springfield, Massachusetts, which functions as the nerve center for the retirement operations of Mass Mutual, which is known and sometimes referred to as Mass Mutual Retirement Services or the Mass Mutual Retirement Services Division.

## IV.     BACKGROUND FACTS

### A.     <u>The Services That Mass Mutual Provides To The Plans</u>

17.     At all pertinent times, Mass Mutual has held itself out and continues to hold itself out to Plaintiff and the Class as providing a full array of services, that Mass Mutual can help design and maintain a long-term retirement strategy for a company and its employees and that "MassMutual has been an innovator in meeting the changing needs of plan sponsors and participants for more than half a century."  *See* http://www.massmutual.com/productssolutions/businessesorganizations/businessneed/retirementplanning/retirementproducts.

18.     Mass Mutual represents itself as having "one of the most experienced teams in the retirement industry" and that "MassMutual is at the forefront of innovation in the retirement

services industry." *See* http://www.massmutual.com/retire/participants.  In fact, in describing its

retirement services, Mass Mutual states as follows:

> The right provider should have the financial strength to be there for the long term and ***should be dedicated to helping every one of your participants save more***.

> MassMutual has decades of experience working with retirement advisors and plan sponsors to develop retirement plans that meet the needs of organizations and employees. With a strong record of success, fiduciary guidance and expertise, a commitment to innovation and a team of passionate professionals to support you through the entire process, MassMutual can help you make the decisions that are right for you.

http://www.massmutual.com/retire/plansponsors

19.     The retirement services of Mass Mutual are provided from a corporate perspective

by Mass Mutual Life Insurance Co. and certain related/affiliated companies that are collectively

known as Mass Mutual Financial Group and/or Mass Mutual Retirement Services Division.

20.     The Plans' assets that are held in the Separate Accounts (defined below) are

included in the over $400 billion that Mass Mutual has under management.

21.     Mass Mutual is considered a leader in providing services to the "micro" (less than

$5 million in assets) and "small" (between $5 million and $50 million in assets) employer

retirement markets, which markets include retirement plans such as the GSI Plan.  Mass Mutual

markets itself as providing employers, such as GSI, with the full range of services sufficient to

offer retirement benefits to its employees.

22.     One of Mass Mutual's most profitable lines of business is providing services

associated with retirement and benefit plans.  In its 2010 Annual Report, Mass Mutual touts that

it has provided "over 60 years of innovative solutions for retirement plan sponsors and

participants."  Mass Mutual also represents that it provides services to approximately 120 million

retirement plan participants and more than 7,500 retirement plans.

23.     The retirement plan services Mass Mutual provides include recordkeeping, compliance, allocation of participant contributions, distribution of account proceeds to departing participants, loan processing and administrations, asset transfer, IRS tax withholding and reporting, provision of benefits illustrations, processing and distribution of benefits and withdrawals, and administration of communications with participants.

24.     Mass Mutual explains the services that it provides to 401(k) plans and other defined contribution plans, including the Plans at issue, as follows:

> Defined contribution plans are an important way for companies to help their employees prepare for retirement. Defined contribution plans, including 401(k) plans, are company-sponsored, tax-deferred retirement savings plans. Growth in these plans typically depends on employee and/or employer contributions and investment selections. Companies of all sizes may offer defined contribution plans as a way to both attract and retain employees by helping them save for retirement.
>
> Additionally, MassMutual's Smart ArchitectureSM investment program has been designed for plan sponsors, their participants and investment consultants looking to put together a diverse investment program. We tap into some of the most talented money managers in the industry to provide investment options to drive plan health and participant retirement readiness.
>
> MassMutual's defined contribution plan services include:
>
> - Internet services for plan sponsors and participants
> - A multi-manager investment program
> - Creative and informative communications
> - Experienced relationship management to coordinate services
> - Innovative systems
> - A dedicated conversion team

In sum and substance, Mass Mutual markets itself as a full-service provider to meet the needs of the Plans.

**B.      The Agreements Between The Plans And Mass Mutual And
         The Retirement Investments Provided Under Those Agreements**

25.      Pursuant to the terms of Group Annuity Contracts or Group Funding Agreements
(the "Contracts" or "Group Contracts"), Mass Mutual represents that it manages Plaintiff's and
other Class members' retirement plan assets.  Mass Mutual enters into these standard form Group
Contracts with virtually all of the Plans.

26.      Pursuant to the Group Contracts or similar group funding agreements, Mass
Mutual provides investment options to the GSI Plan, and other similarly situated Plans, through
insurance products called group variable annuities or through similar insurance
arrangements/vehicles.

27.      Pursuant to the terms of the Group Contracts, the Plans' retirement assets are
invested in one of three general options: (a) a Fixed Account, Fixed Interest Account, Guaranteed
Interest Account, Guaranteed Principal Account or similar name, which are sometimes referred
to as "stable value funds" (collectively, the "Fixed Account") in which Mass Mutual (i) takes
custody and control of the Plans' retirement assets and places them in its general account (as a
fiduciary under applicable law because, *inter alia*, Mass Mutual takes ownership of these
retirement assets and makes all investment decisions with respect to those assets while
determining its own fee), (ii) commingles those retirement assets with Mass Mutual's other
assets in its general account (while subjecting those retirement assets to the risks undertaken by
Mass Mutual in conducting its business enterprise and subjecting those retirement assets to
claims by the general creditors of Mass Mutual), (iii) generally guarantees a minimum rate of
return, and (iv) sets its own rate of compensation by earning the spread between the return

achieved on Mass Mutual's own investment of these retirement assets and the rate of return established by Mass Mutual (which Mass Mutual retains the right to adjust in its own discretion), while retaining the discretion and ability to effectively reduce the rate of return below the supposedly guaranteed rate of return, based upon Mass Mutual's own interests, including its profitability; (b) a Capital Preservation Account or general accumulation account or similar investment ("GAA"), which is described as a "market value separate account," which is "wrapped" by a general account guarantee to pay a stated rate of return and provide book value transfers and distributions pursuant to which (i) Mass Mutual owns all of the retirement assets contained in those accounts (and for which Mass Mutual indisputably functions as a fiduciary under applicable law), (ii) guarantees a stipulated rate of interest for a specified time period, (iii) is invested in a Separate Account established under Massachusetts or other state law, (iv) is not charged with the liabilities of Mass Mutual to the extent of the reserves and anticipated contract liabilities of the GAA, but otherwise is subject to the claims of creditors of Mass Mutual, (v) generally guarantees a minimum rate of return, and (vi) sets its own rate of compensation by earning the spread between the return achieved on Mass Mutual's own investment of these retirement assets and the rate of return established by Mass Mutual, which Mass Mutual effectively retains the right to adjust in its own discretion by eliminating or changing the terms of the GAA; and (c) Separate Accounts created by Mass Mutual for the purpose of investing in mutual funds, which (i) Mass Mutual owns along with all of the retirement assets contained in those accounts (and for which Mass Mutual indisputably functions as a fiduciary under applicable law), (ii) are created under and pursuant to Massachusetts law or other state laws, (iii) are not charged with the liabilities of Mass Mutual to the extent of the reserves and anticipated

contract liabilities of those accounts, but otherwise are subject to the claims of creditors of Mass Mutual, (iv) buy and hold the shares of the mutual funds in which the Plans' participants choose to invest, (v) are utilized by Mass Mutual as the tool to negotiate revenue sharing or participation agreements with the mutual funds so that Mass Mutual can earn additional compensation that bears no relationship to the services that it provides to the Plans and/or the mutual funds.

28.    Plans and their participants do not invest directly in the mutual funds, but invest in "variable accounts," including the "Separate Accounts," as well as the "Fixed Account" discussed above, all of which are established by Mass Mutual.

29.    The Separate Accounts are established, administered, owned and managed by Mass Mutual and the Separate Accounts' assets are segregated from the general assets of Mass Mutual.

30.    The Separate Accounts are part of an investment vehicle known as a group variable annuity offered by Mass Mutual.  A group variable annuity is an insurance contract that provides for both general account (*i.e.,* the Fixed Account) and "Separate Account" investments.  These types of investment vehicles are used to fund qualified retirement plans, like 401(k), profit-sharing, and other types of company-sponsored retirement plans.  The Separate Accounts permit Mass Mutual to pool the investments of the Plans to invest in mutual funds and similar investments.  The assets of each Separate Account are segregated (or separate) from all of the other assets of Mass Mutual but, as explained above, are not entirely immune from the claims of creditors of Mass Mutual.  The Separate Accounts purchase and own selected mutual funds or other funds/investment vehicles that mimic the performance of these mutual funds.

31.    The Separate Accounts maintained by Mass Mutual are divided into sub-accounts

that correspond to the mutual funds and other investment options available under the Group

Contracts that Mass Mutual maintains with the Plans.

32.     The Separate Accounts are divided into accumulation units (sometimes referred to

as "record units") that track the performance of shares of a selected mutual fund investment with

the price per accumulation unit calculated by dividing the total value of the assets of the Separate

Account by the number of units in the Separate Account.

33.     Pursuant to the Group Contracts, participants may choose the mutual funds in

which their contributions and any matching contributions made by their employers are invested,

and Mass Mutual allocates those contributions to particular sub-accounts within the Separate

Accounts that correspond to the chosen mutual funds.   In return for the contributions, which are

assets of these ERISA qualified plans, the Plans and their participants receive accumulation units

(shares) in the applicable sub-accounts of the separate accounts, which accumulation units, like

the Separate Accounts themselves and the sub-accounts, are held and owned by Mass Mutual.

34.     Mass Mutual maintains authority and control over the Separate Accounts, the

sub-accounts and the accumulation units.

35.     The accumulation units of the Plans and their participants, which are held by Mass

Mutual, like the Separate Accounts and sub-accounts, constitute assets of the Plans.

36.     Based on the combined contributions to the sub-accounts made by all of these

Plans and their participants, Mass Mutual sells and purchases mutual fund shares to hold in the

Separate Accounts (and receives revenue sharing kickbacks in return for these purchases).

37.     The value of a plan's accumulation units (shares) in the Separate Account

fluctuates based upon the value of the mutual fund shares held within the various sub-accounts.

–11–

38.     Pursuant to the Group Contracts administered and managed by Mass Mutual and issued in the names Mass Mutual, Mass Mutual manages the retirement assets of the Plans in the Separate Accounts and serves as legal title owner and holder of the assets in the Separate Accounts.  The investments of the GSI Plan are held in Separate Accounts in the name of Mass Mutual, which are administered and managed by Mass Mutual as well.

39.     Mass Mutual exercises discretionary authority and control with respect to the Plans' assets held in the Separate Accounts by, among other things, electing to receive dividends from the mutual funds into the Separate Accounts in the form of additional mutual funds shares and/or by making the affirmative investment decision to reinvest all cash dividends from mutual funds in additional mutual fund shares of the same mutual funds.

40.      Under the terms of its own Group Contracts, and in recognition of its fiduciary status, Mass Mutual holds the Plans' assets in Separate Accounts under its own name, places those funds in short-term investments as it sees fit (*i.e.*, in its discretion), and may set off certain amounts the funds held in those Separate Accounts, based on its own unilateral determinations with respect to the non-payment of fees and other factors, before ultimately transferring the Plans' assets to mutual funds in return for which it is paid kickbacks.

41.     Mass Mutual also influences its own compensation by effectively electing to receive all dividends payable to the Plans from mutual funds in the form of additional mutual fund shares, thereby increasing the amount of the assets of the Plans in the Separate Accounts and under Mass Mutual's management, thereby increasing the amount of revenue sharing kickbacks payable to Mass Mutual.

42.     Mass Mutual exercises discretion, authority and control with respect to the Plans'

assets and acts as a fiduciary by managing the Plans' investments in the Fixed Account and placing those assets of the Plans in the general account(s) of Mass Mutual.  Mass Mutual determines its own compensation with respect to the Fixed Account investments and has breached its fiduciary duty to the Plans by extracting excessive compensation in connection with its investments in the Fixed Account.

43.     Mass Mutual also places the Plans' investments in a "suspense account" (or the equivalent thereof) when awaiting further or clarifying investment instructions from the Plans' participants, acts as a fiduciary with respect such temporary accounts and, even during this holding period, earns, without justification, impermissible revenue sharing payment kickbacks and other fees from its suspense account investments.

44.     Mass Mutual indisputably holds, owns, administers, manages and controls the Separate Accounts, as well as their sub-accounts, and uses the Separate Accounts as a delivery mechanism to purchase and sell shares in the mutual funds.

45.     In direct return for delivering these funds from the Separate Accounts to the mutual funds, Mass Mutual receives the revenue sharing kickbacks at issue pursuant to the scheme detailed herein.

46.     Mass Mutual owns and manages the Separate Accounts and maintains and exercises discretion and control with respect to the retirement assets in the Separate Accounts. Mass Mutual is able to influence and control its own compensation derived from the Separate Accounts by, among other things, negotiating the terms of the participation agreements with the mutual funds, which generally make revenue sharing payments on the basis of the assets invested by the Separate Accounts in their mutual funds.  As detailed in the Group Contracts, Mass

Mutual maintains complete discretion to substitute, eliminate and add funds within its Separate Accounts. Mass Mutual also reserves the right to transfer assets of the Plans between Separate Accounts and to make changes within the Separate Accounts, including creating new divisions of the Separate Accounts, creating new Separate Accounts and new segments or divisions of those accounts, combining any two or more Separate Accounts segments or divisions, making available additional or alternative divisions of the Separate Accounts investing in additional investment companies, investing the assets of the Separate Accounts in securities other than shares of the funds; operate the Separate Accounts as a management investment company under the 1940 Act or withdraw such registration if no longer required; substitute one or more funds for other funds with similar investment objectives; delete funds or close funds to future investments; and change the names of investments in the Separate Accounts.

47.     Mass Mutual also controls the menu of available mutual funds offered in its Separate Accounts and retains the discretion to change its fund menus and to not offer certain investment options to Plans based upon contract pricing and other considerations.

48.     Under the Group Contracts, Mass Mutual also retains and exercises the discretion and control to self-determine its own compensation under the Separate Accounts by (a) calculating the current value of the Separate Accounts by applying a "daily asset charge," which Mass Mutual calculates itself based on so-called "expense risks" and which can, in Mass Mutual's discretion, include a profit payable to Mass Mutual, and (b) applying so-called "experience credits" to reduce or increase the fees charged to the Separate Accounts, based upon Mass Mutual's unilateral determination. Mass Mutual uses its ownership of and control over the Separate Accounts and their assets, as well as this discretion and control which it exercises, to,

among other things, negotiate for the receipt of revenue sharing payments from mutual funds.

49.     Upon information and belief, Mass Mutual also utilizes the assets contained in the Separate Accounts, including the GAA, all of which appear on its balance sheet, to earn additional compensation, independent of the revenue sharing payments by utilizing uncommitted assets in these Separate Accounts to engage in certain hedging transactions, securities lending transactions and to negotiate for the payment of additional compensation from third parties on the basis of its ownership and control of these retirement assets.  Thus, Mass Mutual utilizes its ownership and authority over the Separate Accounts, as well as the discretion and control that it exercises over the Separate Accounts, to earn additional, undisclosed compensation from third parties by essentially investing the retirement assets of its customers through schemes and utilizing devices independent, separate and apart from the investment of these assets in mutual funds and other contemplated investments.  Upon information and belief, Mass Mutual also requires directly or indirectly that all Plans offer the Fixed Account option to their participants. Mass Mutual imposes this contractual requirement because, regardless of the suitability of the investment for any given plan or participant, historically the spread that it has earned on its Fixed Account investment options is enormous and that spread serves as source of significant profits for Mass Mutual, which bear no relationship to the services provided to the Plans at issue by Mass Mutual (and thereby serves to provide Mass Mutual with unreasonable and excessive compensation).

50.     Pursuant to the Group Contracts, in addition to earning the spread on the Fixed Account and the GAA, Mass Mutual charges the GSI Plan, and other similarly situated Plans, separate account fees (typically referred to as "mortality and expense risk charges" or "wrap

−15−

fees"), which are calculated by taking a percentage of the daily value of a given plan's investment in the Separate Accounts in and through which Mass Mutual purchased, sold and held the shares of the underlying mutual funds.

51.     The Group Contracts also obligate the GSI Plan, and other similarly situated Plans, to pay Mass Mutual brokerage commissions, transfer taxes and any expenses incurred by Mass Mutual, which Mass Mutual determines are reasonably necessary to preserve or enhance the value of the assets in the sub-accounts (which are expressed in terms of accumulation units discussed below)  representing these Plans' ERISA qualified retirement investments.

52.     The Group Contracts do not disclose that revenue sharing payments will be made to Mass Mutual by the mutual funds offered as investments to the Plans or that Mass Mutual will utilize the Separate Accounts and Fixed Accounts investments to generate profits based upon the existence and leveraging of these assets for Mass Mutual's own benefit.

**C.     The Plans**

53.     At all pertinent times, the GSI Plan was a 401(k) retirement plan and, as of the date of the filing of this Complaint, it remains a 401(k) retirement plan (and since the "GSI Plan" is defined collectively to include two distinct plans, there are and remain two distinct 401(k) retirement plans constituting the "GSI Plan" as defined above).  GSI and its Plan's participants have funded and continue to fund the Plan.

54.     Under the Plans' basic contract documents, and through the Group Contracts with Mass Mutual, participants are entitled to invest in various mutual funds selected by Mass Mutual for inclusion as investment options within the Plans' investment menus.

55.     Plaintiff is informed and believes that thousands of qualified ERISA retirement

Plans are members of the Class, as defined below, which contracted with Mass Mutual to provide the same or services with respect to the management and administration of the Plans and the disposition, investment and management of these Plans' assets.

**D.      The Relationship Between and Among Class Members, Mass Mutual and The Mutual Funds**

56.      The employers that are the sponsors and administrators of the Plans, which compose the Class, engage full-service providers, such as Mass Mutual, to design and implement the qualified ERISA retirement plans and to provide an entire range of administrative, investment, management and other services necessary to operate them.  Agents of Mass Mutual solicit business on its behalf on the basis that it is a full-service provider that designs and implements such qualified ERISA retirement plans, and these agents for Mass Mutual receive commissions for obtaining such business for Mass Mutual.

57.      In promoting its services, Mass Mutual claims to be a leading provider for corporate retirement plans that offers a comprehensive array of retirement solutions for its customers.

58.      After setting up a qualified ERISA retirement plan such as Plaintiff's Plans, Mass Mutual provides all of the services necessary for such plans to operate, including recordkeeping, compliance, allocation of participant contributions, distribution of account proceeds to departing participants, loan processing and administration, asset transfers, IRS tax withholding and reporting, provision of benefits illustrations, processing and distribution of benefits and withdrawals, and administration of communications with participants.

59.      Mass Mutual knew or reasonably should have known of the material importance

of fees and costs to the Plans and their participants, including the amount of any "revenue sharing payments."

60.     Mutual funds contract with various entities to perform managerial, administrative, accounting, legal and other services.  Mutual funds pay the entities providing those services, and the mutual funds pass those costs on to their investors by charging them a variety of fees, which are typically referred to as investment management fees, distribution fees, commissions, sub-transfer agency fees, marketing fees or 12b-1 fees.  Investors thereby effectively pay fees to the mutual funds for these and other services.  The mutual funds determine these fees, based on a designated percentage of the net asset value of all of the shares held in the mutual fund, causing the net asset value of all of the shares to decrease by the proportionate percentage attributable to these shares.  As a result of the charging of these fees, by way of example, the value of the mutual fund shares held by Mass Mutual in the Separate Accounts decreases by a corresponding percentage, which, in turn, reduces the value of each of the Plans' and each of the participants in the Plans' accumulation of units held by Mass Mutual in the Separate Accounts.

61.     At all relevant times, the mutual funds offered by Mass Mutual to the Plans have been offered through Group Contracts and similar contracts.  Certain of these funds have been owned and/or operated by Mass Mutual itself or its subsidiaries or affiliates.

62.     In return for the fees and other amounts charged to the Plan and other similarly situated Plans, Mass Mutual selects, maintains and monitors a menu of mutual funds available for investment by these Plans while, as explained above, reserving the right to unilaterally change the composition of that menu of mutual funds.

63.     Pursuant to its contracts with the GSI Plan and other similarly situated ERISA

−18−

retirement Plans, Mass Mutual has the discretion to unilaterally cease offering mutual funds selected by participants and substitute in their place other investments selected by Mass Mutual. Upon information and belief, Mass Mutual has added, removed or substituted offerings of mutual funds on its menu of available investments for current and future Plans.

64.     Under the Group Contracts, Mass Mutual retains the unfettered and sole discretion both to delete any Separate Account and the corresponding mutual fund investment established and to offer new Separate Account investments.

65.     Mass Mutual retains the discretion, authority and control to delete and add investment options from the Plans' available menu of investments.

66.     Mass Mutual also retains the right and discretion to unilaterally change its investment management and administrative charges assessed under the GAC.

67.     Mass Mutual has engaged investment advisors and other professionals to review the investment options available to participants in the Plans, allegedly to ensure that the investment options comprise a wide array of asset classes and money managers that can be used to build a well diversified retirement program for 401(k) participants, as well as to manage certain proprietary funds offered by Mass Mutual.  Mass Mutual's primary criterion for inclusion of a mutual fund on its menu of funds, as well as the selection of advisors to manage proprietary mutual funds, however, is the amount of revenue sharing payments that the mutual fund is willing to pay Mass Mutual, and this criterion trumps the appropriateness of the investment and/or the size of fees and costs that the Plans (and their participants) will be required to pay as a result of, *inter alia*, asset-based charges and the share classes of the designated mutual funds. Indeed, in its marketing and other materials, Mass Mutual attempts to conceal the nature of the

higher cost share classes that it includes in its retirement offerings as providing certain advantages to Plans when, in fact, the only reason for the inclusion of these higher cost share classes of the mutual funds is that (a) the mutual funds can use these higher fee share classes to earn greater compensation, and (b) Mass Mutual can share in this increased compensation in the form of revenue sharing payments/kickbacks.

68.     The mutual funds establish the percentages of the Plans' assets that they charge as fees for their services to cover their normal operating expenses, as well as anticipated profit, and the amount of the revenue sharing payments that they have agreed to make to Mass Mutual.

69.     The revenue sharing payments do not bear any relationship to any services performed by Mass Mutual.  In fact, Mass Mutual cannot ascribe specific services performed to the revenue sharing payments received and, when Mass Mutual obtains increased revenue sharing payments from mutual funds, it provides no additional services. Instead, Mass Mutual literally has lined its pockets with tens of millions of dollars in revenue sharing payments by and through self-dealing, other prohibited transactions and breaches of fiduciary duty.

70.     In certain materials available to customers, Mass Mutual has recently, obliquely and deceptively referenced its receipt of revenue sharing payments, including 12b-1 fees, service fees and sub transfer agency/expense reimbursement fees.  In referencing such revenue sharing payments, however, Mass Mutual has attempted to mask the nature of these kickback payments by falsely and deceptively claiming that the payments relate to the provision of services by Mass Mutual on behalf of the mutual funds, even though the payments at issue bear no relationship to any services that Mass Mutual purportedly provides on behalf of the mutual funds.  In addition, although Mass Mutual has claimed in certain communications that the revenue sharing payments

are used to reduce the amount of payments made by the Plans, Mass Mutual has not and does not

provide any specific credit to the Plans to account for the revenue sharing payments that it

receives (and Mass Mutual has not calculated or directly attributed the reduction in any fees

charged to the Plans to the actual amount of revenue sharing payments received by Mass

Mutual).

71.     In recognition of the fact that Mass Mutual deliberately attempts to conceal the

true nature and magnitude of the revenue sharing payments, Mass Mutual only provides its

customers, including Plaintiff, with detailed information regarding its receipt of revenue sharing

payments upon written request and then falsely or deceptively asserts that the "revenue sharing

payments" are used to offset expenses paid by the Plans when, in fact, no such offset occurs.

72.     At all pertinent times, Mass Mutual's receipt of the revenue sharing payments and

other improper compensation delineated in this Complaint constituted a continuing violation of

ERISA and was fraudulently and deceptively concealed by Mass Mutual.

73.     Even assuming *arguendo* that Mass Mutual contends that it somehow adequately

disclosed the existence and nature of these revenue sharing payments, regardless of how it

obscured such disclosure (or purports to assert that any of the Plans consented to its conduct),

Mass Mutual's receipt of revenue sharing payments for its own account is *per se* unlawful and

cannot be excused by alleging that there was any purported disclosure or consent.  Similarly,

Mass Mutual's receipt of compensation on its own account by leveraging the assets contained in

the Separate Accounts and the Fixed Accounts, which amounts to self-dealing and the self-

payment to Mass Mutual of unreasonable compensation through the investment and use of the

Plans' retirement assets, violates applicable law (specifically, ERISA).

74.     While effectively keeping the revenue sharing payments a secret from its customers and the Plans, Mass Mutual regularly negotiates with mutual funds to increase the amount of these payments despite the undesirable impact of increased payments on Plaintiff and the Plans.

**E.      The Revenue Sharing Scheme**

75.     Mass Mutual holds itself out to Plaintiff, the Class and the public as an expert in administering employee pension benefit plans and with respect to developing investment strategies, goals and philosophies and making investment recommendations.

76.     At all pertinent times, Mass Mutual implemented and participated in a scheme whereby mutual funds made revenue sharing payments to it based upon a percentage of the Plans' assets invested in these mutual funds, respectively, by and through Mass Mutual.  Mass Mutual explicitly made it a condition to offering a mutual fund family's funds to the Plans that the mutual fund family pay it revenue sharing on all or most of the funds offered and/or recommended by Mass Mutual.

77.     To implement this scheme, Mass Mutual negotiated revenue sharing agreements with mutual funds on behalf of itself and its affiliates.

78.     Revenue sharing payments are made to Mass Mutual pursuant to written contracts ("revenue sharing contracts" or "participation agreements"), often also referred to as service contracts, administration contracts, fund services contracts, fund participation contracts and broker dealer contracts, and these contracts are often entered into by and between Mass Mutual and the mutual funds or the investment management firms that provide management and other services to mutual funds.

79.     These revenue sharing payments may be in the form of 12b-1 fees (which are supposed to be fees for marketing of the fund), administration fees, service fees, sub-transfer agent fees and/or similar fees.  All of the revenue sharing payments are based, in whole or in part, on a percentage of a given plan's investment in a mutual fund and/or based on the magnitude of the investments by the Plans in the mutual fund.

80.     While the revenue sharing payments are often described in participation agreements as reimbursements for expenses incurred in providing services to the mutual funds, those services by which mutual funds may incidentally benefit are actually ones that Mass Mutual had historically provided to the Plans as a necessary part of its business in return for the fees directly collected by it, and these fees did not change as a result of revenue sharing or based upon the percentage or the magnitude of a plan's investments in the mutual fund.

81.     The revenue sharing payments are generally calculated based upon a percentage of the Plans' assets invested in the mutual funds by and through Mass Mutual.  These amounts are not based on the cost of providing the services or a reasonable fair market value for Mass Mutual's services.  Typically, the fees for Mass Mutual's services would be provided on an annual per participant basis and not on a percentage of assets or revenue sharing basis. Furthermore, the reasonable fair market price of Mass Mutual's services would be significantly less than the amounts of the revenue sharing payments received by it.  Finally, Mass Mutual earns disproportionate profits on the basis of the revenue sharing payments it receives.

82.     At all pertinent times, Mass Mutual has been arranging for, receiving and keeping the revenue sharing payments for its own use and benefit, in breach of its fiduciary duties under ERISA.  These revenue sharing payments range from twenty-five (25) basis points of the total

assets of the Plans to substantially greater revenue sharing payments.

83.     Under all of the circumstances, the revenue sharing payments received by Mass

Mutual constituted excessive fees and otherwise violated ERISA because the receipt of these

revenue sharing payments constituted prohibited transactions under ERISA.

**F.     Mass Mutual Also Improperly Earns Income On The Fixed Account, GAA And
Separate Accounts Through Its Conflicted Arrangements And Self-Dealing**

84.     Mass Mutual also earns excessive compensation in breach of its fiduciary and

legal duties, through the "spreads" that it earns on the investments in the Fixed Account and

GAA.  As explained above, Mass Mutual effectively engages in self-dealing by establishing its

own compensation with respect to the investment of these retirement assets, which excessive

compensation Mass Mutual assiduously conceals from the Plans and their participants.

85.     Mass Mutual also has utilized investments in the Separate Accounts through

leveraging and securities lending schemes to earn additional, undisclosed compensation and

these acts of self-dealing have resulted in Mass Mutual earning additional, undisclosed and

excessive compensation as a result of its use of the Plans' retirement assets for its own profit and

gain.

## V.     CLASS ACTION ALLEGATIONS

86.     This action is brought as a class action by Plaintiff, on behalf of itself and the

following proposed class ("Class"):

### Class

All administrators of employee pension benefit plans covered by
the Employee Retirement Income Security Act of 1974 subject to
Internal Revenue Code §§ 401(a), (k) with which Mass Mutual has
maintained a contractual relationship based on a group annuity

–24–

contract or group funding agreement.

Excluded from the Class are Defendant, any administrators of employee pension benefit plans for which Defendant's directors, officers or employees are beneficiaries and any employee pension benefit plans for which the Judge to whom this case is assigned or any other judicial officer having responsibility for this case is a beneficiary.

87.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

88.     **Numerosity**.  Plaintiff is informed and believes that there are at least thousands of Class members throughout the United States.  As a result, the members of the Class are so numerous that their individual joinder in this action is impracticable.

89.     **Commonality**.  There are numerous questions of fact and/or law that are common to Plaintiff and all the members of the Class, including, but not limited to the following:

(a)     whether Defendant acted and continues to act as fiduciary under ERISA in connection with the conduct described herein;

(b)     whether Defendant breached its fiduciary duties under ERISA by failing to defray the reasonable expenses of administering the Plans;

(c)     whether Defendant engaged in prohibited transactions by receiving the revenue sharing payments for its own benefit and otherwise earning excessive compensation and effectively charging excessive fees for the administrative, management and investment services it provided to the Plans;

(d)     whether Defendant failed to disclose or inform the Plans of the existence and true nature of the revenue sharing payments, as well as the excessive fees and compensation,

received by Mass Mutual; and

      (e)    whether and what form of relief should be afforded to Plaintiff and the Class.

90.    **Typicality**.  Plaintiff, which is a member of the Class, has claims that are typical of all of the members of the Class.  Plaintiff's claims and all of the Class members' claims arise out of the same uniform course of conduct by Defendant and arise under the same legal theories that are applicable as to all other members of the Class.

91.    **Adequacy of Representation**.  Plaintiff will fairly and adequately represent the interests of the members of the Class.  Plaintiff has no conflicts of interest with or interests that are any different from the other members of the Class.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including class actions under ERISA.

92.    **Predominance**.  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court, as well as the parties, will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial function and which does not bar certification.

93.    **Superiority**.  A class action is superior to all other feasible alternatives for the resolution of this matter. The vast majority, if not all, of the Class members are unaware of Defendant's breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually. Furthermore, even if they were aware of the claims they have against Defendant, the claims of virtually all Class members would be too small to economically justify

individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and of the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

94.     **Manageability**.  This case is well suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

95.     Defendant has acted on grounds generally applicable to the Class by uniformly subjecting the Plans to the revenue sharing scheme described above, which scheme Defendant clearly intends to continue to perpetrate in the future.  Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

**COUNT I**

**(For Breach Of Fiduciary Duty)**

96.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

97.     Defendant is a fiduciary of the Plans under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), as explained above, and is a fiduciary based on its discretion, authority and/or control with respect to the administration, management and/or disposition of the Plans and their assets, and its provision of investment advice for a fee or other compensation with respect to the monies or other property of the Plans and Defendant's authority and responsibility with respect to the administration and management of the Plans and their retirement assets.

−27−

98.     Defendant controls the selection of the mutual funds available as investment options for the Plans and participants, provides investment advice for compensation with respect to these investment options, uses its custody, control, ownership and dominion over the Separate Accounts and accumulated units of assets of the Plans and uses its discretionary authority and responsibility in the administration of the Plans to obtain revenue sharing payments from the mutual funds and to earn other compensation from self-dealing as described above.

99.     Defendant is prohibited from receiving benefits in connection with its position as a fiduciary of the Plans.

100.    The revenue sharing payments made by the mutual fund companies to Mass Mutual constitute plan assets because: (a) Mass Mutual received the payments as a result of its fiduciary status or function (*e.g.*, because Mass Mutual received payments from mutual funds in exchange for offering and/or recommending the funds as an investment option to the Plans and their participants); (b) the mutual funds make payments to Mass Mutual at the expense of the Plans and participants (*e.g.*, because the mutual funds set the fees they charge Plans and participants to cover not only the fees they would normally charge but also the amount of the revenue-sharing payments they have to make to Mass Mutual); and/or (c) revenue sharing payments effectively constitute the proceeds of the Plans' and participants' investments.

101.    Mass Mutual is a fiduciary under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(a), with respect to the revenue sharing payments, because it has discretion and control, or exercises authority, with respect to the management or disposition of these payments by arranging for, accepting and retaining them either directly or through its subsidiaries or affiliates.

102.    Mass Mutual's arranging for and retention (or the retention by their affiliates or

subsidiaries) of the revenue sharing payments, as set forth above, violates its fiduciary duties under ERISA § 404(a)(1)(A) and (B), 29 U.S.C. § 1104(a)(1)(A) and (B), in that Mass Mutual failed and continues to fail to discharge its duties with respect to the Plans solely in the interest of the Plans' participants and beneficiaries and (a) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the Plans with (b) the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

103.    Mass Mutual breached its fiduciary duties, by using its discretion and control over or influence with respect to the Fixed Account and Separate Accounts, as well as their accumulation units, to generate the revenue sharing payments and other improper compensation for its own benefit.  Mass Mutual did not use the Fixed Account, Separate Accounts and the accumulation units for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and failed to act with the care, skill, prudence and diligence of a prudent person.  As to the revenue sharing payments themselves, to the extent they constitute Plan assets, Mass Mutual failed to use them for the exclusive purpose of providing benefits to participants and their beneficiaries and defraying reasonable expenses of administering the Plans and also failed to act with the care, skill, prudence and diligence of a prudent person.

104.    As a direct result of Defendant's breaches of duties, Plaintiff and the Class have suffered losses and damages.

105.    Pursuant to ERISA § 408, 29 U.S.C. § 1109, and ERISA § 502(a), Defendant is

liable to restore to the Plans the losses they have suffered as a direct result of Defendant's breaches of fiduciary duty and is liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs and other recoverable expenses of litigation.

## COUNT II

### (For Breach Of Fiduciary And Violation Of ERISA's Prohibited Transaction Rules)

106.    Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

107.    Mass Mutual has engaged in and continues to engage in prohibited transactions in violation of ERISA § 406(b)(1), 29 U.S.C. § 1106(b)(1), by dealing with the assets of the Plans in its own interest or for its own account.

108.    Mass Mutual's receipt and retention (or the receipt and/or retention by its affiliates or subsidiaries) of the revenue sharing payments, as set forth above, constituted and continues to constitute prohibited transactions under ERISA § 406(b)(3), 29 U.S.C. § 1106(b)(3), in that the receipt of revenue sharing payments by Mass Mutual amounts to and constitutes a fiduciary receiving consideration in the form of revenue sharing payments for its own personal account from parties such as mutual funds that are dealing with the Plans in connection with transactions (*i.e.*, the purchase and sale of mutual fund shares) involving the assets of the Plans held in the separate accounts or sub-accounts, and/or represented by the accumulation units. Specifically, the mutual funds deal with the Plans by accepting funds from Separate Accounts that represent the investment of the Plans' assets, and they do so in connection with transactions involving the assets of the Plans.  Furthermore, as explained above, Mass Mutual also has

engaged in prohibited transactions with respect to its control over the investments in the Fixed Account and Separate Accounts and its earning of improper and excessive compensation through acts of self-dealing and by acting solely for its own benefit, as opposed to for the benefit of the Plans.

109.    Pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2), Mass Mutual is liable to the Plans to credit back, disgorge and/or make restitution of all revenue sharing payments and other improper compensation received by it; or, alternatively, Mass Mutual is liable to the Plans and the Class to pay damages or make restitution to the Plans in an amount representing the difference between the revenue sharing payments and other compensation that it received, and the reasonable fair market value of any services provided by Mass Mutual.

110.    Plaintiff and the Class also are entitled to all equitable or remedial relief as the Court may deem appropriate and just.

111.    Pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), the Class seeks an order declaring that the above-described practices of Mass Mutual in connection with the revenue sharing payments and its earning of excessive compensation through self-dealing violate ERISA, as set forth above, and seeks a permanent injunction preventing Mass Mutual from engaging in such conduct in the future.

## COUNT III

### (For Co-Fiduciary Breach And Liability For Knowing Breach Of Trust)

112.     Plaintiff incorporates the allegations in the previous paragraphs of this Complaint as if fully set forth herein.

113.     In the alternative, to the extent that Defendant is not deemed a fiduciary or co-fiduciary under ERISA, Defendant is liable to the Class for all recoverable damages and relief as a non-fiduciary that knowingly participated in a breach of trust.

WHEREFORE, Plaintiff, Golden Star, Inc., on behalf of itself and the Class, demands judgment against Defendant, Mass Mutual Life Insurance Co., for the following relief:

(a)     Declaratory and injunctive relief pursuant to ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3) as detailed above;

(b)     Disgorgement, restitution and/or damages as set forth above, plus all other equitable or remedial relief as the Court may deem appropriate pursuant to ERISA §§ 409(a) and 502(a)(2), 29 U.S.C. §§ 1109(a) and 1132(a)(2);

(c)     Pre judgment and post judgment interest at the maximum permissible rates, whether at law or in equity;

(d)     Attorneys' fees, costs and other recoverable expenses of litigation; and

(e)     Such further and additional relief to which Plaintiff and the Class may be justly entitled and the Court deems appropriate and just under all of the circumstances.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all claims so triable.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of ERISA § 502(h), 29 U.S.C. § 1132(h), the undersigned hereby affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated:  October 19, 2011                     Respectfully submitted,


/s/ Michelle H. Blauner
Michelle H. Blauner (BBO# 549049)
Charles E. Tompkins (BBO# 678276)
Shapiro Haber & Urmy LLP
53 State Street
Boston MA, 02109
Telephone:  (617) 439-3939
Facsimile:  (617) 439-0134
Email: mblauner@shulaw.com
          ctompkins@shulaw.com

John M. Edgar
John F. Edgar
EDGAR LAW FIRM LLC
1032 Pennsylvania Ave.
Kansas City, MO  64105
Telephone: (816) 531-0033
Facsimile:  (816) 531-3322
Email: jme@edgarlawfirm.com
          jfe@edgardlawfirm.com

−33−

James E. Miller
Patrick A. Klingman
Laurie Rubinow
Karen M. Leser
Shepherd Finkelman Miller
 & Shah, LLPC
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (860) 526-1120
Email: jmiller@sfmslaw.com
         pklingman@sfmslaw.com
         lrubinow@sfmslaw.com
         kleser@sfmslaw.com

Ronald S. Kravitz
Liner Grode Stein Yankelevitz Sunshine
Regenstreif & Taylor LLP
199 Fremont St., 20th Fl.
San Francisco, CA  94105
Telephone: (415) 489-7700
Facsimile:  (415) 489-7701
Email: rkravitz@linerlaw.com

*Attorneys for Plaintiff*
*and the Proposed Class*