UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GOLDEN STAR, INC., | ) | |
| Plan Administrator of the Golden Star | ) | |
| Administrative Associates' 401(k) Plan | ) | |
| and Golden Star Bargaining Associates' | ) | |
| 401(k) Plan, on Behalf of Itself and All | ) | |
| Others Similarly Situated, | ) | Civil Action No.: 3:11-CV-30235-MAP |
| | ) | |
| Plaintiff, | ) | Hon. Michael A. Ponsor |
| | ) | |
| v. | ) | |
| | ) | |
| MASS MUTUAL LIFE INSURANCE CO., | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MEMORANDUM IN SUPPORT OF ITS
## MOTION TO DISMISS AND TO STRIKE THE JURY DEMAND

### INTRODUCTION

Defendant Massachusetts Mutual Life Insurance Company ("MassMutual") provides

retirement plan services to 401(k) plans throughout the country, including the 401(k) plans

sponsored by plaintiff Golden Star, Inc. ("GSI").  When a company like GSI wants to provide a

401(k) plan, it contracts with MassMutual to provide the administrative services needed to make

the plan available to GSI's employees.  One of the services that MassMutual provides is an

extensive menu of investment options, mainly consisting of options to invest in mutual funds.

GSI in turn selects a subset of these investment options to offer to its employees, who then

determine into which options they will invest their 401(k) contributions.  MassMutual is

compensated for its services, and one of the primary means by which it is compensated is

through payments from the mutual funds that plans select as investment options.  GSI refers to

these payments as "revenue sharing" payments, and contends that they are unlawful under

ERISA, even though for many plans, they are a significant component of MassMutual's compensation for its services. These arrangements are not unique to MassMutual; on the contrary, most of MassMutual's competitors use such arrangements.

This motion does not challenge (at least at this stage) GSI's claims relating to revenue sharing. Rather, this motion is directed at two portions of the complaint that have nothing to do with revenue sharing and have no business being part of the case. The Complaint alleges claims directed at three types of investment options that MassMutual offers its 401(k) plan customers: (1) mutual funds (which are offered through separate accounts), (2) the Guaranteed Interest Account ("GIA"), and (3) the Capital Preservation Account ("CPA"). All claims relating to these last two options should each be dismissed.

First, the claims relating to the GIA should be dismissed because the assets invested in that account are not "plan assets." Each of the ERISA claims that GSI asserts is predicated on the notion that MassMutual acts as an ERISA fiduciary, and fiduciary liability only attaches to assets of a plan. However, the GIA qualifies as a guaranteed benefit policy -- which ERISA defines as a policy which provides benefits that are guaranteed by an insurer -- and Section 401(b)(2) of ERISA declares that the underlying assets are not plan assets, and therefore no fiduciary liability attaches to those assets. *See* 29 U.S.C. § 1101(b)(2). Thus, GSI's claims relating to the GIA should be dismissed.

Second, the claims relating to the CPA should be dismissed because GSI does not allege that it ever invested any assets in the CPA. Thus, GSI could not possibly have been damaged by MassMutual's alleged conduct relating to the CPA. This pleading omission is not an oversight;

MassMutual's records indicate that GSI never invested in the CPA.  Hence, claims relating to the CPA should be dismissed as well.

In addition to dismissing these two claims, this Court should also strike the Complaint's jury demand.  Every court of appeals to have considered the issue, including the First Circuit, has held that there is no right to a jury trial for ERISA claims.  *See, e.g., Hampers v. W.R. Grace & Co.*, 202 F.3d 44, 54 (1st Cir. 2000).

## **FACTUAL BACKGROUND**

The Parties.  MassMutual is a Springfield-based corporation that provides services that enable mainly small and medium-sized businesses to offer 401(k) retirement plans to their employees.  (Compl. ¶¶ 12, 17-24).  For example, MassMutual will assist employers with respect to the initial documentation for their plans, compliance with governmental regulations, and maintenance of records of participant investments in the 401(k) plans.  (*Id.* ¶¶ 23, 58).  The Complaint alleges that MassMutual provides such services to more than 7,500 retirement plans.  (*Id.* ¶ 22).  Two of the 401(k) plans to which MassMutual provides services are sponsored by plaintiff GSI (the "Plans"), a company located in Kansas City, Missouri.  (*Id.* ¶¶ 11, 53).

Group Annuity Contracts.  Companies that elect to receive 401(k) plan services from MassMutual may enter into insurance contracts known as group annuity contracts ("GACs").  (*Id.* ¶ 25).  GSI entered into a GAC with MassMutual on July 1, 1999.  (Copy attached as Exhibit 1).[1]

---

[1] It is well-settled that, in evaluating a motion to dismiss, the Court can consider documents that are referred to in the Complaint.  *See Waterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993)**.**  Here, the Court can consider the contents of the GAC because it is specifically referred to in the Complaint (¶¶ 25-27) and is central to GSI's claims.

Plan Investments.  One of the services that MassMutual provides is a menu of investment options that plan sponsors can select for their employees who will participate in the 401(k) plan. (Compl. ¶¶ 26-27, 54).  Plan sponsors select a subset of these options to offer to their employees, and then employees decide how to allocate their 401(k) contributions among those investment options.  (*Id.* ¶¶ 31, 33).  The plan sponsors forward monies from their employees to MassMutual, which then invests those monies according to the investment instructions provided by the plan's participants.  (*Id.* ¶ 33).

General and Separate Accounts.  The investment options offered by MassMutual under a GAC fall into one of two broad categories:  (1) options in which assets are kept in accounts that are separate and distinct from, and not commingled with, the corporate assets of MassMutual ("separate accounts") and (2) options in which assets are commingled with the corporate assets of MassMutual ("general account").  (Compl. ¶ 27).  Most of the investment options available to plans are separate accounts and the assets associated with separate accounts are invested in mutual funds.  (*Id.* ¶¶ 27(c), 30-40).  In general, each separate account pools the investments of the plans that invest in a single mutual fund.  (*Id.* ¶ 30).  As a result, plans with a GAC do not invest directly in mutual funds, but rather invest in the separate account that corresponds to the designated mutual fund.  This motion is not directed at any of the separate accounts that invest in mutual funds, but those separate accounts are explained here solely to distinguish them from the types of accounts that are the subject of this motion.  This motion is directed at two guaranteed interest rate investment options mentioned in the complaint:  the Guaranteed Interest Account and the Capital Preservation Account.  (*Id.* ¶ 27(a), (b)).  The operation of each of these investment options is explained below.

The Guaranteed Interest Account.  The GIA (which the Complaint refers to as the "Fixed Account") is an investment option whose assets are placed in the general assets of MassMutual, and pays a guaranteed rate of return.  (*Id.* ¶ 27(a)(i)-(iii)).  The GAC defines the GIA as "an account maintained to determine the Contractholder's[2] interest in MassMutual's general investment account.  Amounts in the Guaranteed Interest Account are credited with the Guaranteed Interest Rate."  (Exhibit 1, § 1.07).   Section 2.03 of the GAC spells out the operation of the GIA.  (*Id.*).  It provides that assets invested in the GIA are credited with interest "at an effective annual rate equal to the Guaranteed Interest Rate."  (*Id.* § 2.03B(ii)).  The Guaranteed Interest Rate is an interest rate set periodically by MassMutual, but is guaranteed to be no less than 3%.  (*Id.* § 1.08).  The GAC provides that MassMutual can only amend the GAC by written agreement with GSI.  (*Id.* § 5.11).  Although the GAC provides that MassMutual can also modify the GAC to "comply with applicable law," it specifically prohibits MassMutual from reducing any Guaranteed Interest Rate.  (*Id.* § 5.12).  Participants are also permitted to convert their GIA investments into annuities at rates specified in the GAC.  (*Id.* § 2.03C(iv); §3.03).

As a result of these provisions, the GIA in practice works as follows.  Participants who elect to invest in the GIA have funds transferred to MassMutual's general account.  (Compl. ¶ 27(a)(ii)).  MassMutual credits those investments with the guaranteed interest rate applicable for each period.  MassMutual invests the assets in its general account in an attempt to cover the guaranteed amounts credited to participants.  But MassMutual is required to pay the Guaranteed Interest Rate regardless of whether the return on its general account investments covers the interest payments.  The amounts credited to investments in the GIA thus do not depend upon the success of MassMutual's investment of the funds allocated to the GIA.  If MassMutual's

---

[2] In the GAC, the "Contractholder" is defined to mean the Trustee of Golden Star, Inc.  (Exhibit 1 at cover page).

investment of the general account assets earns more than the Guaranteed Interest Rate,

MassMutual may make a profit, and if not, MassMutual incurs a loss.

The Capital Preservation Account.  The CPA is similar to the GIA in that it pays a fixed

rate of return.  (Compl. ¶ 27(b)).  It is a hybrid, however, in the sense that it has both a separate

account and a general account component.  The monies invested in the CPA are placed in a

separate account, but the investment is "wrapped" by a general account guarantee to pay a stated

rate of return.  (*Id.* ¶ 27(b)(ii)).  Although the complaint discusses the features of the CPA, GSI

does not allege that it ever invested any monies in the CPA.  MassMutual's records confirm that

this omission is not accidental, because neither of the GSI Plans ever invested any amounts in the

CPA.

Complaint.  The Complaint asserts three claims against MassMutual:  (1) breaching its

fiduciary duties under ERISA (Count I), (2) engaging in prohibited transactions under ERISA

(Count II), and (3) an alternative claim for knowing breach of trust in the event that MassMutual

is found not to be a fiduciary (Count III).  (Compl. pp. 27-32).  The Complaint also includes a

demand for "trial by jury as to all claims so triable."  (*Id.* p. 32).

## ARGUMENT

**I.     GSI's Claims Relating to the Guaranteed Interest Account Should be Dismissed
Because the GIA Portion of the Contract is a Guaranteed Benefit Policy and Thus
Not Plan Assets.**

Plaintiff contends that MassMutual misuses the Plans' assets by "placing those assets

…in the general account(s)" and earning a profit that consists of the spread between the

guaranteed interest rates it pays to the Plans and the amount it earns from investing the funds in

its general account.  (Compl. ¶¶ 27(a), 42).  But monies invested in the general account as a

result of the Plans' investment in the GIA are not plan assets.  The GIA investment option is known as a "guaranteed benefit policy."  ERISA specifically provides that monies invested in an insurance company's general account as a result of a guaranteed benefit policy are *not* plan assets.  GSI's claim relating to the GIA thus fails as a matter of law and should be dismissed.

### A.   Guaranteed Benefit Policies under ERISA.

Section 401(b)(2) of ERISA provides:

> In the case of a plan to which a guaranteed benefit policy is issued by an insurer, the assets of such plan shall be deemed to include such policy, but shall not, solely by reason of the issuance of such policy, be deemed to include any assets of the insurer.

29 U.S.C. § 1101(b)(2).  ERISA defines a "guaranteed benefit policy" as:

> an insurance policy or contract to the extent that such policy or contract provides for benefits the amount of which is guaranteed by the insurer.

29 U.S.C. § 1101(b)(2)(B).

Under these provisions, if an insurance company receives assets from a 401(k) plan to fund an insurance contract that pays a guaranteed rate of interest, then the fact that the insurance company commingles those monies with other assets in its general account does not subject the insurer to fiduciary duties.  "Congress did not want to make an insurance company that sells a standard annuity contract -- one that provides 'benefits the amount of which is guaranteed by the insurer' – a fiduciary toward the purchase of the contract."  *Peoria Union Stock Yards Co. Ret. Plan v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 327 (7th Cir. 1983); *accord Mogel v. UNUM Life Ins. Co. of Am.*, 547 F.3d 23, 27 (1st Cir. 2008) (guaranteed benefit policy exemption was meant to free insurance companies from the conflicts involved in managing plan assets and managing assets in its general account).

In *John Hancock Mutual Life Insurance Co. v. Harris Trust & Savings Bank,* 510 U.S. 86 (1993), the Supreme Court interpreted the guaranteed benefit policy ("GBP") provision of ERISA and provided clarification about the sorts of insurance contracts that qualify as GBPs. The Court held that, to determine whether an insurance contract qualifies as a GBP, the contract must be divided into its component parts, and each component must be separately analyzed. *Id.* at 106. Here, because MassMutual is only claiming that the GIA portion of the GAC is a GBP, this Court must analyze that component of the contract.

The *Harris Trust* Court ruled that a component of the contract qualifies as a GBP if it "allocates investment risk to the insurer." *Id.* Risk is allocated to the insurer if the insurer provides a "genuine guarantee of an aggregate amount of benefits payable to the retirement plan participants and their beneficiaries." *Id.* The *Harris Trust* Court held that, to determine whether such a genuine guarantee is made, two key indicators must be present: (1) "the insurer's guarantee of a reasonable rate of return" on the funds invested, and (2) "a mechanism to convert the funds into guaranteed benefits at rates set by the contract." *Id.*

**B.      The GIA Portion of the GAC Qualifies As a Guaranteed Benefit Policy.**

Applying these two criteria from *Harris Trust*, the GIA portion of the GAC plainly qualifies as a GBP. The GIA guarantees a reasonable rate of return and contains an appropriate conversion mechanism.

### 1.      **Guarantee of a Reasonable Rate of Return.**

As to the first criteria, the GIA guarantees a reasonable rate of return.  The GAC provides that funds invested in the GIA will be credited with the Guaranteed Interest Rate, which is an interest rate that cannot be less than 3%.  (Ex. 1, §§ 1.07, 1.08).  These provisions allocate the risk of the GIA investment to the insurer; MassMutual must pay the Guaranteed Interest Rate for the period that the rate is in effect regardless of the rate of return earned on its general account assets.  For example, assuming that the Guaranteed Interest Rate was set equal to the minimum rate of 3%, MassMutual must credit interest at that rate throughout the period, even if MassMutual's own investments of GIA funds earn less than 3%.  MassMutual cannot credit a lower rate simply because its investment returns may not cover the 3% credits.  MassMutual thus bears the investment risk on GIA investments.

Numerous courts have held that similar annuity contracts qualify as GBPs.  In *Associates in Adolescent Psychiatry v. Home Life Insurance Co.*, 941 F.2d 561 (7th Cir. 1991), a pension plan purchased a "Flexible Annuity" in which the insurance company declared a minimum rate of return of no lower than 4%.  The court held that the Flexible Annuity was a GBP because the insurance company "not only set fixed annual rates but also backed its promise with its full assets."  *Id.*  at 568.  The same is true here; MassMutual declares a rate of return backed by the general assets of MassMutual.  MassMutual must pay at least a minimum rate regardless of the results of MassMutual's investments.  *Cf. Rapides Reg'l Med. Ctr. v. Am. United Life Ins. Co.*, 938 F. Supp. 380, 386 (W.D. La. 1996) (acknowledging that a contract providing for guaranteed minimum credits of 3.75% for funds previously on deposit could represent a "meaningful

guarantee of a reasonable rate of return").[3]  Indeed, even without a guaranteed minimum rate, courts have held that so long as an insurance company periodically sets a reasonable rate of return, the insurance contract still qualifies as a GBP.  *See Harper-Wyman Co. v. Conn. Gen. Life Ins. Co.,* No. 86 C 9595, 1991 U.S. Dist. LEXIS 18080, at *13 (N.D. Ill. 1991).

The only occasion on which the First Circuit has interpreted the GBP provisions of ERISA involved a wholly separate type of claim than the one asserted here.  In *Mogel v. UNUM Life Insurance Co.*, 547 F.3d 23 (1st Cir. 2008), plaintiff claimed that the failure to distribute benefits owed under a life insurance contract constituted a breach of the insurer's fiduciary duty. The court held that the GBP exception did not apply because the claim did not involve the management of the underlying assets, but rather involved the duties that the insurance company owed once benefits were due to be paid from those assets.  *Id.* at 27.  GSI's claim does not arise from the payment of benefits; it arises out of the management of the assets in MassMutual's general account, which is what the GBP exception was squarely intended to cover.  Thus, the holding in *Mogel* has no application here.

### 2.    Conversion Mechanism.

The GIA portion of the GAC also contains "a mechanism to convert the funds into guaranteed benefits at rates set by the contract."  *Harris Trust,* 510 U.S. at 106.  Section 2.03C(iv) of the GAC guarantees that amounts can be withdrawn from the GIA and converted to annuities, and the rates for those annuity purchase are set in Section 3.03 of the GAC.  (Ex. 1, pp.

---

[3] In *Rapides*, the court ultimately held that the insurance policy at issue was not a GBP because the insurer reserved the right to "lower or even eliminate altogether its proffered guarantee of a minimum interest rate."  938 F. Supp. at 386.  This holding has no application here because, as noted above, the GAC provides that MassMutual cannot unilaterally amend the contract, and even if there is a change in law, MassMutual cannot change any Guaranteed Interest Rate.  (Ex. 1, §§5.11, 5.12).

16, 28).  Thus, the second condition of the *Harris Trust* test is also satisfied by the GIA portion

of the GAC.

**II.      GSI's Claims Relating to the Capital Preservation Account Should Be Dismissed Because the Plans Never Invested in the CPA and Therefore Could Not Have Been Harmed by MassMutual's Alleged Conduct.**

Plaintiff also contends that MassMutual misuses plan assets invested in the Capital

Preservation Account ("CPA").  Plaintiff contends that, by investing the funds in a manner that

allows MassMutual to earn a profit on the spread between the fixed rate paid on CPA

investments and the rate MassMutual earns on the invested funds, MassMutual has improperly

used plan assets for its own benefit and damaged the GSI plan.  (Compl. ¶ 27(b)).

The problem with this claim is that, even assuming it had some merit (which it does not),

the conduct had no impact on GSI because GSI never invested any amounts in the CPA.  The

Complaint does not allege that either of the Plans ever invested in CPA,[4] and therefore GSI could

not possibly have been damaged by MassMutual's alleged conduct.  As a result, this Court

should dismiss GSI's claims relating to the CPA.

**III.     The Complaint's Jury Demand Should be Stricken Because There Is No Right to a Jury Trial for ERISA Claims.**

On the last page of its Complaint, GSI includes a demand for "trial by jury as to all

claims so triable."  (Compl., p. 32).  But there is no right to a jury trial where, as here, GSI seeks

only equitable relief.  *See Curtis v. Loether*, 415 U.S. 189, 191-93 (1974).  Applying this well-

settled principle, both the First Circuit and district courts in this Circuit have consistently held

---

[4] While the Complaint does not allege anything about investment options the Plans offered to participants, the omission of any allegations regarding the CPA appears not to have been simply an oversight.  MassMutual's records indicate that the Plans never invested any amounts in the CPA.

that there is no right to a jury trial in ERISA cases.  Pursuant to Rule 12(f)(2), this Court should

strike GSI's jury demand.

According to First Circuit precedent, there is no right to a jury trial in an ERISA case

because ERISA claims are equitable in nature.  *See Hampers v. W.R. Grace & Co.*, 202 F.3d 44,

54 (1st Cir. 2000) (holding that plaintiff's common law breach of contract claim against ERISA

fiduciary for failure to enroll plaintiff in plan was preempted, and "the district court did not err

. . . in denying [plaintiff's] demand for a jury trial"); *see also Dudley Supermarket, Inc. v.*

*Transamerica Life Ins. & Annuity Co.*, 302 F.3d 1, 5 (1st Cir. 2002) (holding that ERISA

completely preempts state law claims which are fundamentally ERISA breach of fiduciary

action, and no right to jury trial attaches).

District courts in the First Circuit thus consistently hold that jury trials are unavailable in

ERISA cases.  *See, e.g.*, *Kenney v. State St. Corp.*, No. 09-10750, 2011 U.S. Dist. LEXIS

104202, at *25 (D. Mass. Sept. 15, 2011) (holding that ERISA claims are equitable in nature and

no right to a jury trial is available); *Pepicelli v. Fall River Shirt Co., Inc.*, No. 07-11770, 2010

WL 3749453, at *3 (D. Mass. Sept. 21, 2010) (ruling, in a case alleging claims for breach of

fiduciary duty under ERISA, that "[t]here is no right to a jury trial on an ERISA claim");

*Gammel v. Prudential Ins. Co. of Am.*, 502 F. Supp. 2d 167, 172 (D. Mass. 2007); *Stout v. GTE*

*Prods. Corp.*, 618 F. Supp. 444, 445 (D. Me. 1995); *Lopez v. AstraZeneca Pharm. LP*, No. 05-

1285, 2006 WL 509095, at *5 (D.P.R. Mar. 1, 2006); *Jackson v. Truck Drivers' Union Local 42*

*Health & Welfare Fund*, 933 F. Supp. 1124, 1147 (D. Mass. 1996) ("ERISA actions are

equitable and therefore no right to trial by jury is provided by statute or the Seventh Amendment

to the Constitution.").

Further, the First Circuit is not alone.  Other circuits have uniformly held that there is no right to a jury trial for claims brought under § 502(a)[5] of ERISA because that section only authorizes equitable remedies which must be tried to a judge, not a jury.  *See Sullivan v. LTV Aerospace & Def. Co.*, 82 F.3d 1251, 1258 (2d Cir. 1996); *Pane v. RCA Corp.*, 868 F.2d 631, 636 (3d Cir. 1989); *Berry v. CIBA-GEIGY Corp.*, 761 F.2d 1003, 1006-07 (4th Cir. 1985*); Borst v. Chevron Corp.*, 36 F.3d 1308, 1323-24 (5th Cir. 1994); *Bittinger v. Tecumseh Prods. Co.*, 123 F.3d 877, 883 (6th Cir. 1997); *Matthews v. Sears Pen. Plan*, 144 F.3d 461, 468 (7th Cir. 1998); *In re Vorpahl*, 695 F.2d 318, 322 (8th Cir. 1982); *Thomas v. Oregon Fruit Prod. Co.*, 228 F.3d 991, 996 (9th Cir. 2000); *Adams v. Cyprus Amax Minerals Co.*, 149 F.3d 1156, 1161-62 (10th Cir. 1998); *Blake v. Union Mut. Stock Life Ins. Co. of Am.*, 906 F.2d 1525, 1526 (11th Cir. 1990).

The complaint seeks only equitable forms of relief -- a declaratory judgment, a permanent injunction, and disgorgement and/or restitution.  (Compl. ¶ 10).  More specifically, GSI asks the court to impose liability on MassMutual to "restore to the Plans the losses they have suffered" and "any other available equitable or remedial relief" pursuant to ERISA sections 502(a), 408 and 409.  (*Id.* ¶ 105).  Moreover, GSI requests that this Court order MassMutual to "disgorge and/or make restitution" (*id.* ¶ 109), and seeks "all equitable or remedial relief" and a "permanent injunction" (*id.* ¶¶ 110, 111), pursuant to sections 502(a)(2) and 502(a)(3) which only allow for claims for equitable relief.  The law is clear -- where purely equitable relief is sought, a jury trial is not permitted.  In light of this uniform and well-settled precedent, GSI's demand for a jury trial is improper and should be stricken.

---

[5]Section 502(a)(2) states that "[a] civil action may be brought . . . by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title." 29 U.S.C. § 1132(a)(2).  Section 409, in turn, provides that any fiduciary who breaches his or her duty "shall be personally liable to make good to such plan any losses to the plan resulting from such breach . . . and shall be subject to such other equitable or remedial relief as the court may deem appropriate." *Id.* § 1109.  Section 502(a)(3) provides that "a participant, beneficiary, or fiduciary . . . [may not] enjoin any act or practice which violates [ERISA] or . . . obtain other appropriate equitable relief." *Id.* § 1132(a)(3).

## **CONCLUSION**

For the reasons stated above, this Court should enter an order (1) dismissing the portions of the Complaint asserting claims relating to the Guaranteed Interest Account and the Capital Preservation Account, and (2) striking the Complaint's jury demand.

Respectfully submitted,

/s/ Mark B. Blocker
John P. Pucci, BBO #407560
E-mail:  jpucci@bulkley.com
J. Lizette Richards, BBO #649413
E-mail:  lrichards@bulkley.com
BULKLEY, RICHARDSON, AND GELINAS, LLP
1500 Main Street, Suite 2700
P.O. Box 15507
Springfield, MA  01115
Phone:  (413) 272-6290
Fax:      (413) 272-6804

Joel S. Feldman (*pro hac vice*)
Mark B. Blocker (*pro hac vice*)
Marcus A. Augustine (*pro hac vice*)
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL  60603
Phone:  (312) 853-7000
Fax:      (312) 853-7036
E-mail:  jfeldman@sidley.com
             mblocker@sidley.com
             maugustine@sidley.com

Bernadette Harrigan, BBO #635103
E-mail:  bharrigan@massmutual.com
Massachusetts Mutual Life Insurance Co.
Office of the General Counsel
1295 State Street
Springfield, MA  01111-0001
Phone:  (413) 788-8411

ATTORNEYS FOR MASSMUTUAL LIFE
INSURANCE CO.

Dated:  January 13, 2012

## <u>CERTIFICATE OF SERVICE</u>

I, Mark B. Blocker, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on January 13, 2012.

/s/ Mark B. Blocker
Mark B. Blocker