UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
WESTERN SECTION

```
.........................
Golden Star, Inc.              .
                               .              Civil No.
      v.                       .          11-30235-MAP
                               .
MassMutual Life Insurance .
.........................
```

Before the Honorable Michael A. Ponsor,
United States District Court Judge,
Motion Hearing Held on **April 25, 2013**.

<u>APPEARANCES</u>:


See the following page:


Alice Moran, CSR, RPR, RMR
Official Federal Court Reporter
300 State Street, Room 303D
Springfield, MA 01105
Tel: (413)731-0086  Fax: (413)737-7333
alice.moran@verizon.net

1    <u>APPEARANCES</u>:

2

3    **For the plaintiffs**:  James Miller, 65 Main Street,
     Chester, CT 06412.

4
     Robert Ditzion, 53 State Street, Boston, MA 02109.

5
     Laurie Rubinow, 65 Main Street, Chester, CT 06412.

6
     Ronald S. Kravitz, One California Street, Suite 900, San

7    Francisco, CA 94111.

8

9

10   **For the defendant**:  Mark B. Blocker, One South Dearborn,
     Chicago, IL 60603.

11

12   Joel Feldman, One South Dearborn, Chicago, IL 60603.

13   John P. Pucci, 1500 Main Street, Suite 2700, PO Box 15507,
     Springfield, MA 0115-5507.

14
     J. Lizette Richards, 1500 Main Street, Suite 2700, PO Box

15   15507, Springfield, MA 01115-5507.

16   Bernadette Harrigan, 1295 State Street, Springfield, MA
     01101.

17

18

19

20

21                  Alice Moran, CSR, RPR, RMR
                  Official Federal Court Reporter
22                 300 State Street, Room 303D
                      Springfield, MA 01105
23            Tel: (413)731-0086  Fax: (413)737-7333
                     alice.moran@verizon.net
24

25

INDEX

Witness Name:          Direct    Cross     Redirect     Re-cross

None

Plaintiffs' Exhibits:                                  Page

None

Defendant's Exhibits:                                  Page

None

1    (Hearing commenced.)

2              THE COURT:  Good afternoon.  Please be seated.

3              THE CLERK:  Judge, the matter before the Court

4    is Golden Star versus MassMutual, Civil Action 11-30235.

5              THE COURT:  What I want to do is begin by having

6    counsel introduce themselves and then I would like to see

7    if I can't summarize what I understand the background of

8    the case to be and what the issues are that bring us here

9    today.  Then from that, I hope, will allow us to focus in

10   on what seem to me to be the central issues here.  I won't

11   preview that yet.  I'll get to that in a moment.

12       Why don't I just start by having counsel introduce

13   themselves, and I'll start here.

14             MR. MILLER:  Good afternoon, Your Honor.  James

15   Miller.  With me is my colleague Laurie Rubinow.

16             THE COURT:  Could I have a spelling on your

17   name?

18             MS. RUBINOW:  Yes, it's L-a-u-r-i-e.

19             THE COURT:  L-e-u-r-i-e.

20             MS. RUBINOW:  Actually it's L-A.

21             THE COURT:  Okay.  L-A-U -- oh, Laurie.  I got

22   that.  The last name was what I was looking for.  Sorry.

23             MS. RUBINOW:  It's Rubinow.  R, as in Roger,

24   U-B, as in boy, I-N, as in Nancy, O-W.

25             THE COURT:  Very good.  Thank you.

1          MS. RUBINOW:  Thank you.

2          MR. KRAVITZ:  Ron Kravitz from Liner, Grode.

3          THE COURT:  Mr. Kravitz.

4          MR. DITZION:  And Robert Ditzion from Shapiro,

5     Haber & Urmy.  D-I-T, as in Thomas, Z, as in zebra, I-O,

6     as in ostrich, N, as in Nancy.

7          THE COURT:  Okay.  And on MassMutual's side you

8     are all here for the plaintiff.

9        Mr. Pucci.

10          MR. PUCCI:  John Pucci for MassMutual, Your

11     Honor.  I'll let counsel introduce themselves, but I want

12     to advise the Court that we've divided the arguments.

13     Mr. Blocker will be arguing MassMutual's motion to strike

14     the plaintiffs' expert report and Mr. Feldman will be

15     arguing the class issues.

16          THE COURT:  Okay.  We may get to neither of

17     them.  I have some suggestions for how I want to go here

18     so all of your elaborate preparations may have to be the

19     usual trial lawyer's quick adjustments.

20          MS. RICHARDS:  Good afternoon.  Lizette Richards

21     also representing MassMutual.

22          THE COURT:  Okay.

23          MR. FELDMAN:  Good afternoon, Your Honor.  I'm

24     Joel Feldman for MassMutual.

25          THE COURT:  Mr. Feldman.

1          MR. BLOCKER:  Good afternoon, Your Honor.  Mark

2    Blocker, B-l-o-c-k-e-r.

3          THE COURT:  All right.

4          MS. HARRIGAN:  Good afternoon, Your Honor.

5    Bernadette Harrigan, MassMutual Law Department.

6          THE COURT:  Ms. Harrington, thank you very

7    much.

8          MS. HARRIGAN:  Thank you.

9          THE COURT:  Here is the background of the case,

10   and I've made some notes to make sure that I understand

11   how this works.  This may be a little crude but I think it

12   may be good enough for this afternoon's argument.

13       Golden Star is a plan administrator for a number of

14   401(k) plans which are similarly named.  They have the

15   name Golden Star in them and I'm going to take the plan

16   administrator and plans and kind of call them as a group

17   Golden Star.

18       Golden Star hired, and may even continue to hire,

19   MassMutual to perform services related to the

20   administration of the 401(k) plans.

21       These plans -- the services that MassMutual provides

22   them, many of them are not even at issue here, they are

23   accounting services, tax services, keeping track of things

24   and paying out distributions, and work that MassMutual

25   does for Golden Star in connection with the 401(k) plans,

and MassMutual preforms these services and charges Golden

Star a fee for doing this.

MassMutual also makes recommendations or offers

mutual funds that the 401(k) plans can invest in, and they

receive in some, but not all cases, money back from the

mutual funds based upon the investment of the monies that

belong to Golden Star through MassMutual or based upon

MassMutual's advice into the mutual funds.

So there's something called an expense ratio which

seems to be a term to describe the monies that are paid by

Golden Star to MassMutual, and there's something which the

plaintiffs at least call revenue sharing which is the

money that comes back from the mutual funds to MassMutual

based upon the investments of the monies in the 401(k)

plans.

There's also money that is charged by the mutual

funds apparently directly to Golden Star having to do with

the investments by Golden Star of its funds, in mutual

funds.

Now, the letter that was drafted by a representative

of the Department of Labor, a woman named Bette J. Briggs,

Chief of Fiduciary Interpretations Office of Regulations

and Interpretations -- it seems to me to be a bureaucratic

entity located inside Hogswarts (phonetic).  It's a really

interesting but semimystical organization in the

1    government that governs these plans and this is a

2    remarkably clear letter.

3        I read a lot of government letters and this one is

4    unbelievably easy to read even for somebody who doesn't

5    know anything about this.

6        Ms. Briggs, I don't know who she is but I hope they

7    gave her a tremendous bonus because she did a terrific job

8    on this letter.  The letter identifies an obvious conflict

9    of interest that lies as a potential in this flow of funds

10   among these entities because, of course, if MassMutual is

11   getting money from the mutual funds to pay it for the

12   monies that its clients like Golden Star invest in the

13   mutual funds, there's problem A that MassMutual might be

14   more interested in referring its clients to funds that

15   were making these payments and not all funds do.

16       And there also is a problem that the mutual funds

17   charge Golden Star and the other 401(k) plans certain fees

18   and the mutual funds might be tempted to jack up their

19   fees to the 401(k) plans to give themselves more money to

20   kickback to MassMutual and therefore get MassMutual to

21   steer the investments into the particular mutual funds.

22   So that's a problem.  We can all see that.  That's not too

23   hard to discern.

24       So the way that an entity like MassMutual tries to

25   get around this, at least as MassMutual puts it and as the

1    letter appears to recognize, is what it does is it takes

2    the money that it gets from the mutual funds and credits

3    that money, it says, against the fees that it charges to

4    Golden Star and its other 401(k) clients, and so the

5    argument is that it is in some sense a wash.

6         They take money that they get kicked back but they

7    give the money in a sense back to their clients by

8    lowering the fees, the so-called expense ratio that they

9    charge to their clients.

10        Now why they don't just not take any money from the

11   mutual funds and get the fees from the 401(k) plans is a

12   mystery that's beyond me.  You can just eliminate the

13   whole problem if you're going through all this.  But, in

14   any event, I don't know anything about that but it just

15   occurs to one.

16        Now, the problem here apparently is that MassMutual

17   is not able -- well, MassMutual has to base its payments

18   to its clients and calculate them based on historical

19   revenue flows, and apparently sometimes MassMutual

20   over-credits the money that they calculate they're going

21   to be getting from the mutual funds against the fees and

22   there's a bit of a windfall for the 401(k) plan, and

23   sometimes it under-credits the deduction from the fees and

24   the 401(k) plan gets burned.  MassMutual is getting more

25   money back from the mutual funds than it gives to the

1    particular client.

2        I believe it's Golden Star's position as a

3    preliminary matter we don't have to do any of those

4    calculations.  MassMutual ought to give back everything it

5    gets from the mutual funds.  That's not proper.  The

6    accounting is very simple.  Give us everything that you

7    got back from the mutual funds.  I think that's one of the

8    theories of recovery that its expert witness proposes and

9    that's the subject of the *Daubert* motion.

10       There's a fallback calculation of damages, as I

11   understand it, proposed by the expert which involves

12   trying to come up with some way of calculating the money

13   or the financial advantage that MassMutual has enjoyed

14   from getting these funds back from its mutual funds.

15       So we're here today on the question of class

16   certification and there are quite a few arguments about

17   why the claims of the plaintiff here are not typical of

18   the claims of other potential class members and why the

19   potential class representative is not an adequate

20   representative of the interests of the other potential

21   class members and that has to do with differences in how

22   you would go about calculating liability, different levels

23   of knowledge on the part of different 401(k) plans, and

24   things of that sort.

25       So let me get to what I was struggling with as I

1      prepared here and this is where we're going to veer off

2      slightly from -- or maybe we'll veer off slightly from the

3      central topic of today's hearing, which is the class

4      certification issue and, to a lesser extent, the motion to

5      strike the expert report.

6          Here is the question posed provocatively:  Why

7      shouldn't I deny the motion for class certification

8      without prejudice and have you submit a motion for summary

9      judgment on the substantive issue of whether MassMutual is

10     a fiduciary of Golden Star?

11         MassMutual's position is we are not a fiduciary of

12     Golden Star.  I was impressed by the name of the

13     individual plan trustees Earl and Ray Julo, J-u-l-o.  I

14     don't whether I'm pronouncing that name correctly.

15              MR. MILLER:  Mr. Julo.

16              THE COURT:  Julo.  They make all the decisions,

17     according to MassMutual.  MassMutual did not perform any

18     services; did not exercise any discretion; did not do

19     anything which would justify a conclusion that they fall

20     into the fiduciary category.

21         If MassMutual is not a fiduciary in relation to

22     Golden Star, 75 or 80 percent of Golden Star's claim

23     drains out.  I think there may be an alternate theory that

24     the plaintiff has if Golden Star is not considered a

25     fiduciary.

1          I think if MassMutual is not a fiduciary to Golden

2     Star, you've got a tough argument with regard to the

3     adequacy of representation that you can offer to other

4     potential class members as to whom MassMutual was a

5     fiduciary.

6          As I read the papers, MassMutual at least takes the

7     position that of the whole corpus of potential class

8     members Golden Star lies over on the very edge in terms of

9     its relationship or the profile of its relationship with

10    MassMutual as that would bear on the issue of fiduciary

11    responsibility.

12         That MassMutual absolutely -- and maybe I'm

13    overstating the argument and if I am, I will stand

14    corrected, but MassMutual absolutely takes the position

15    that it is not a fiduciary for Golden Star.  It may be for

16    others, or at least others will have stronger arguments or

17    other class members might potentially have stronger

18    arguments that MassMutual was a fiduciary, but according

19    to MassMutual Golden Star has no argument, no viable

20    argument, that MassMutual was a fiduciary.

21         If that's the case, why do I tackle class

22    certification now?  Why not tackle that substantive issue?

23    If I decide that Golden Star was in a fiduciary

24    relationship with MassMutual, that's going to affect the

25    complexion of the case.

1    If I decide that MassMutual was not a fiduciary as to

2    Golden Star, most of the case goes and we have -- you'll

3    have to refresh my recollection -- this possible residual

4    claim that the plaintiff offers that does not rely upon a

5    fiduciary relationship.

6        So what I'm presenting to you is a proposal or at

7    least my own suggestion that let's put off tackling the

8    issue of class certification and let's just go right to

9    whether they've got a claim, period.

10       I don't think the facts are disputed.  There may be a

11   little bit more discovery you have to clean up, but the

12   relationship is what the relationship is and then the

13   decision by me, and perhaps my friends in Boston

14   ultimately, will be is this a fiduciary relationship that

15   you two are in?  And if it isn't, I don't see how you get

16   your class.

17       So it's your motion for class certification.  I'll be

18   happy to hear what you have to say, but I'm interested in

19   that.

20       I guess I will say one other thing before we wrap up,

21   and that is I ran into this exact question in another case

22   that I have involving Veterans' life insurance policies.

23   In that case it was a class certification issue and I have

24   the substantive issue under advisement right now.  We're

25   working on the memorandum of that.  We jumped over the

1    class certification and we went to the substantive

2    question, and the substantive question will have a huge

3    bearing on whether the class is appropriately certified.

4    So let me hear from you.

5              MR. MILLER:  Thank you, Your Honor.  Is it

6    acceptable if I speak from here?

7              THE COURT:  Whichever place you're more

8    comfortable is fine.

9              MR. MILLER:  Thank you, Your Honor.  I can't

10   recall the name of the case but I was thinking I believe

11   in August of 2012 you took a similar approach in an ERISA

12   case and I think in general that approach may make good

13   sense.

14       The two reasons that I think it may not be the best

15   approach here, one, is because I don't think that under

16   the facts of this case MassMutual can legitimately contest

17   its fiduciary status.

18             THE COURT:  Okay.

19             MR. MILLER:  In their group annuity contract, we

20   quoted this in our class certification motion, it

21   specifically reads "MassMutual has exclusive and absolute

22   ownership and control of the assets in the separate

23   investment accounts.  Only MassMutual will have any

24   individual, legal, or equitable ownership of any

25   investments or assets of the separate investment

1    accounts."

2        Then it goes on and says, "All assets of MassMutual

3    are invested by MassMutual as it, in its sole discretion,

4    may determine, subject to applicable laws and regulations

5    including, but not limited to, the discontinuance of a

6    separate investment account."

7        And then it goes on and says "In the exercise of its

8    sole discretion, MassMutual may, from time to time, hire

9    an investment advisor registered under the Investment

10   Advisors Act of 1940 to invest"  -- I'm sorry -- "to

11   assist in the investment of assets."

12       That language in the group annuity contract, which is

13   common to the class, establishes MassMutual's fiduciary

14   status, and Mr. Miles in his deposition, we quoted in our

15   class certification motion, acknowledges that fiduciary

16   status.

17       One thing, I'm just sort of anticipating the response

18   by MassMutual, is the question of whether in a sense

19   that's game over for MassMutual.

20            THE COURT:  Right.

21            MR. MILLER:  We think it is for one important

22   reason.  This case is a prohibited transaction case.  Our

23   breach of fiduciary duty claim is entirely derivative of

24   the breach of the derivative transaction claim.

25       Rule 406(b) of ERISA establishes that a fiduciary

1  cannot deal with assets in its own interest and it cannot

2  receive consideration on its own account in connection

3  with a transaction involving plan assets.

4      So we believe the fact that they're a fiduciary for

5  that reason, in addition as Your Honor noted there's some

6  recent briefing submitted with respect to the *Leimkuehler*

7  decision in the Seventh Circuit which Mr. Feldman and his

8  colleagues ably handled on behalf of the defendant in that

9  case, the reality in the *Leimkuehler* case and the

10  distinction between that case and this case is this is a

11  prohibited transaction case.  So that once fiduciary

12  status is established for any purpose, MassMutual was

13  subject to those prohibited transaction rules.

14      Respectfully, Your Honor, I do believe that in

15  passing MassMutual challenges Golden Star's adequacy and

16  typicality, but I only think they do so with respect to

17  their argument that we abandoned a portion of the class

18  related to what they call Pero or PERA accounts which are

19  clients' reimbursement expense accounts, and I think the

20  existence of the Plan Expense Reimbursement Accounts in

21  this case is quite important because --

22      THE COURT:  I'm going to stop you for a second

23  before you get into the PERA accounts.

24      As far as -- I may ask to hear from MassMutual about

25  this in just a second.  As far as the issue of the

fiduciary relationship is concerned, it seems to me that
we are in one of three positions:  Either MassMutual
concedes that they're a fiduciary, in which case I just
wasted a lot of your time.  We don't need to have any
hearing on it.

I didn't think they conceded that they were a
fiduciary.  If they have, then I can stand corrected and
we can move on.  So that's possibility number one.  If
MassMutual concedes they're a fiduciary, then we don't
have to have a hearing on whether they're a fiduciary or
not.  That's for sure.

Two, MassMutual does not concede that they're a
fiduciary but there is enough briefing contained in the
class certification papers for me to make a determination
at this point as to whether they're a fiduciary and
resolve that issue without the necessity of the filing of
any motions for summary judgment or further briefing.
I'll just decide it based upon the papers here.

Or, three, MassMutual does contest that they are a
fiduciary and it hasn't been adequately briefed and we may
need additional discovery and that's going to be something
that you will have to brief and litigate down the road.
Those are one of the three things.

You seem to suggest -- well, certainly from your
point of view there's no question that they're a

1   fiduciary.

2           MR. MILLER:  That's right.

3           THE COURT:  That I can do it in a paragraph and

4   find that they were a fiduciary.  I thought they were

5   contesting that they were a fiduciary.

6       There's a big chunk of their memorandum -- sort of a

7   little over halfway through their memorandum where they

8   kind of plod along in fairly, what seem to me, a fairly

9   detailed argument that they don't fall into the category

10  of being a fiduciary.  Did I miss that?  Did I

11  misinterpret that argument?  Did I overlook something?

12          MR. MILLER:  I don't want to speak for

13  MassMutual and I'm sure they don't want me to either, but

14  my understanding of that argument is that they -- I don't

15  think they -- they may contest it now, but I don't think

16  they seriously contest that they occupy a fiduciary status

17  with respect to separate accounts.

18          THE COURT:  Okay.

19          MR. MILLER:  I think the argument that they will

20  make is they are not wearing a fiduciary hat when they

21  engaged in certain activities, and our response to that is

22  that although that may be an analysis that's applicable

23  under Section 404 and was the basis in part the

24  Leimkuehler decision, that that's not an applicable

25  analysis with respect to 406(b) which is the core claim

1      here.

2              THE COURT:  Let me just -- I'm going to go to

3      MassMutual in just a second, but I just want to clear up

4      one other thing which is of interest to me.

5          You say this is a prohibited transaction case under

6      406(b).  Does that mean that your argument, as I tried to

7      summarize in the beginning, that whatever Ms. Briggs may

8      have said in her letter about ways that entities like

9      MassMutual cross in that case could try to deal with this

10     conflict of interest, this was a prohibited transaction.

11         They never should have gotten a dime from any of

12     those mutual funds and no matter what they may have done

13     to adjust their fee relationship with your client and the

14     other class members, that's irrelevant.  It's a prohibited

15     transaction and you're entitled or your clients are

16     entitled to a full refund of any monies that they received

17     from the mutual funds.  Is that your argument?

18             MR. MILLER:  No, Your Honor.  I think that, one,

19     we believe that the teaching of the Frost letter is

20     correct and that the analysis was not -- although it was a

21     Section 404 breach of fiduciary analysis, it also was a

22     prohibited transaction analysis.

23         The point of the Frost letter in particular that Ms.

24     Briggs, as I agree does a great job of summarizing and

25     explaining, is that in order for a fiduciary such as

1    MassMutual to receive revenue sharing payments, it has to

2    create a system where it credits those revenue sharing

3    payments on a dollar-for-dollar basis in one of two ways:

4    Either it directly credit all of the revenue sharing

5    payments or it can have an obligated fee that exists,

6    separate and apart from the revenue sharing payments, and

7    the revenue sharing payments can be used to reduce that

8    fee.

9        The Frost letter goes on to say, of course, that if

10   those revenue sharing payments ever exceeded that

11   obligated fee, that amount would need to be credited to

12   the account.

13       What Frost does, and as Ms. Briggs explains, is it

14   eliminates any potential or possibility for any kind of

15   mischief with respect to the revenue sharing payments

16   because it eliminates any kind of incentive on the part of

17   MassMutual to offer more expensive mutual funds because

18   they pay more revenue sharing payments or to negotiate or

19   increases its revenue sharing payments during the life of

20   the contract, which we produced evidence that that occurs.

21       I believe Mr. Wietsma says that they engage in

22   competitive intelligence to see if any of their

23   competitors get more and then they will go and negotiate

24   to try to get more.  And when they do get more, there's no

25   process in place for the plaintiffs and the proposed class

1   to receive any credit for that increase in the revenue

2   sharing payment.  That increase inures to the benefit of

3   MassMutual, which we think is the whole purpose and reason

4   for the Frost letter to eliminate that kind of mischief.

5       Now, just going back briefly to the PERA account,

6   interestingly here and the reason that we excluded the

7   PERA account is respectfully we believe that Golden Star

8   is completely adequate and typical with respect to the

9   proposed class in the class certification papers and we

10  don't believe that MassMutual had produced any evidence

11  that they are any different than any of the other plans.

12      We could talk about their affirmative defenses if we

13  decide to go down that road, but what we learned in

14  discovery in the case, in the class certification

15  discovery, was that there was the existence of this PERA

16  account.  That for certain of the plans that MassMutual

17  has they will credit revenue sharing payments that they

18  consider to be excess compensation to that PERA account.

19      Now those exists for certain plans but not the plans

20  in the proposed class.  Frankly the reason we proposed the

21  modified class definition, as compared to our compliant,

22  was in recognition of the fact that MassMutual at least

23  has an argument with respect to the PERA accounts that it

24  in some way is -- we don't think they're necessarily

25  following the letter of Frost with respect to the PERA

1    accounts, but they're considerably closer to Frost with

2    respect to the PERA accounts than they are with respect to

3    the proposed class.

4              THE COURT:  Okay.

5              MR. MILLER:  And just finally with respect to

6    your questions, I don't think I addressed whether

7    discovery would be necessary.  We have limited discovery

8    to class certification.  So I do think if you were going

9    to go down the road of briefing summary judgment, I think

10   there probably will be a necessity of engaging in some

11   discovery but we'll certainly work to try to make that as

12   limited as possible and I think most of the evidence has

13   been adduced.

14             THE COURT:  Thank you.

15        So I'm sorry I've dumped this on you here, but I'm

16   interested in hearing MassMutual's position on this notion

17   that I have of grappling with the substantive issue before

18   we grapple with the class certification.

19             MR. FELDMAN:  Certainly, Your Honor.  I think I

20   can answer your question and respond to a few remarks made

21   by my ably adversary very briefly.

22        First, obviously you're free to procedurally tell us

23   to brief summary judgment and deny without prejudice class

24   certification.  That's self-evident.

25        I would note, and I know Your Honor is aware, that

1   the Seventh Circuit just affirmed a grant of summary

2   judgment in what we think is an identical case finding no

3   fiduciary duty with respect to *American United Life* in

4   that revenue sharing case and so that would be in our

5   judgment powerful precedent if you wanted to go that

6   route.

7       To answer Mr. Miller's point that somehow we have

8   conceded that we are a fiduciary because of our

9   administration over the separate account, most decidedly

10  we have not.

11      I would also add that in the *American United Life*

12  case the Seventh Circuit tackled that very issue, slip

13  opinion on pages 12 through 15, and the Seventh Circuit

14  overtly found that administration of a separate account

15  does not create a fiduciary duty.  It's just plan simple

16  right there by the Seventh Circuit.

17      In addition, the main reason is you have to have some

18  exercise of discretion and that's what the Seventh Circuit

19  said.  If you're just a conduit for money because an

20  insurance company must have a separate account, you're not

21  exercising any discretion.  The participants tell us where

22  to put the money.  We don't decide where to put the money.

23      Also it's an important point that the fiduciary

24  status would have to relate to the allegation of the case.

25  You could be a fiduciary with respect to service of

1    process but you're not a fiduciary for anything else if

2    you'll accept service of process, but we're not a

3    fiduciary here in any sense of the word.

4         THE COURT:  All right.  Well, then let me lay

5    out the same alternatives.

6         So, as I said before, there were three possibilities:

7    One, is that you concede that you're a fiduciary for

8    purposes of this litigation and it's pretty clear you

9    don't concede that.

10   I'm not sure that Mr. Miller actually said that you

11   did concede it.  He said he thought you would have a hard

12   time not conceding it based upon what he thought was the

13   controlling language, but he wasn't presuming that you

14   actually would stand up and concede it.  So, anyway,

15   that's off the table so that leaves us with two other

16   options.

17        One is there's enough -- and I've got enough paper in

18   front of me.  I have a heck of a lot of paper in front of

19   me that you guys have submitted, that I'm in a position as

20   I sit here right now, with a little more argument from

21   you, to decide the fiduciary issue without any further

22   discovery or briefing.

23        It's a dangerous thing to do of course because if we

24   proceed that way, it gives the plaintiff two arrows in

25   their quiver.  They can claim that under Rule 56F they're

1    entitled to more discovery which they haven't got, and if

2    any decision in your favor went that way would be

3    premature and it would be unwrapped by the First Circuit.

4         So if we're going to go further, I think I would give

5    both sides a reasonable opportunity to complete discovery

6    on the fiduciary issue, and then we have motions on the

7    question of the fiduciary issue and we go from there.

8         So what I'm assuming is that if we need to tackle the

9    issue of your client's status as a fiduciary, you guys

10   have got a little bit more work to do, maybe a lot more

11   work to do, and at least some more work to do before I am

12   going to be in a position to give you a ruling on that.

13   Am I correct in that?

14            MR. FELDMAN:  I think that's fair, Your Honor.

15   I would say that there has been a large amount of

16   discovery.  We've worked out all issues and we've been

17   able to get along.

18        There's been many depositions at the 30(B)(6) level

19   and the traditional level, large amounts of documents

20   produced, but I do think it's a fair statement from Your

21   Honor that if we're going to go the summary judgment

22   route, and I just have a couple more items to add on that,

23   but if we're going to go the summary judgment route, that

24   the cautious approach would be to allow some additional

25   discovery.

1           THE COURT:  Okay.  Now let me see if I can

2   clarify one other thing and then I'm sure you have a

3   couple more things to say.

4        This question might have been directed better at Mr.

5   Miller, but let me direct it at you for the moment, and

6   that is my recollection of the case, and I may be

7   misremembering it, is that the bulk of the case relies

8   upon your being a fiduciary in relation to Golden Star and

9   the other potential class members, but there's a portion

10  of the case where I think the plaintiff takes the position

11  that even if you aren't a fiduciary, they still have a

12  viable cause of action against you which they intend to

13  pursue.  It that true, and how does that weave into the

14  analysis here?

15       Did you want to say something, Mr. Miller?

16           MR. MILLER:  I think I can help Mr. Feldman.

17  Count 3 of our complaint is we're not a fiduciary engaging

18  in a fiduciary breach.  You are correct, Your Honor, that

19  I do agree with you that if Your Honor is inclined to hear

20  summary judgment briefing, that it would be appropriate to

21  limit the questions to just fiduciary status because that

22  is candidly the bulk of the plaintiffs' claims in this

23  case.

24           THE COURT:  Thank you.

25           MR. FELDMAN:  Just very briefly, a few

1    additional items.  One reason you may want to address

2    class certification, first recognizing it's Your Honor's

3    preference --

4              THE COURT:  Sure.

5              MR. FELDMAN:  -- is that while we think that we

6    should win summary judgment on a fiduciary status, as we

7    did for *AUL* and as the Seventh Circuit affirmed on *AUL*,

8    fiduciary status is just one element.  You could still be

9    a fiduciary and class certification could be denied.

10       You'd have the issues of breach; you'd have the

11   issues of affirmative defenses; you'd have the issue of

12   individualized damages which the Supreme Court in *Comcast*

13   recently said individualized damages could overwhelm many

14   common issues.  So that would one possible reason to do

15   class certification first.

16             THE COURT:  Right.

17             MR. FELDMAN:  I would also add, Your Honor, that

18   another reason you might consider undertaking class

19   certification first is that the *AUL* opinion, when you

20   combine it with the *ING* ruling, I think makes very clear

21   that whether anyone is a fiduciary is fact intensive.

22       The federal court in *ING* did find that *ING* was a

23   fiduciary mistakenly.  I could explain why but that's not

24   the purpose of the hearing at this moment, but note that

25   *AUL* expressly found the opposite and with *AUL* the Seventh

1    Circuit expressly affirmed the opposite that the ruling by

2    Judge Wood was very fact intensive.

3        Judge Wood said we're affirming Judge Magnus-Stinson

4    on that fiduciary status or any breach because with

5    respect to the addition and deletion of mutual funds,

6    there's two very specific facts.  It's only happened twice

7    and once it was for a Vanguard fund where there was no

8    revenue sharing, and once it was beyond the statute of

9    limitations.

10       Now again, MassMutual takes the strong position that

11   we're never a fiduciary, but I think the Seventh Circuit's

12   ruling juxtaposed against *ING* shows that with different

13   facts you could have different conclusions.  So you may

14   want to consider class certification first.

15       Two other items very quickly.  Mr. Miller claimed in

16   his pleading filed yesterday and just a couple moments ago

17   when he presented his statement to you that prohibited

18   transaction was not before the court in *AUL* and that's

19   just decidedly wrong.

20       If I could, Your Honor, this is the district court's

21   summary judgment ruling from *AUL*.  May I present it?

22            THE COURT:  If it's in F.supp, I will find it.

23            MR. FELDMAN:  It is, but at pages 6 through 8 of

24   the ruling, it's in F.supp, Judge Magnus-Stinson expressly

25   deals with prohibited transaction and it was overtly

1    before the court.  I'm the lead counsel in *AUL*.  It was

2    overtly before the court and it went up to the Seventh

3    Circuit.  That was one of the issues that went up.  The

4    Seventh Circuit admittedly then ruled that there was no

5    fiduciary status whatsoever, but prohibited transaction

6    was absolutely front and center, as was breach of

7    fiduciary duty, in *AUL*.

8         Mr. Miller stated that somehow MassMutual negotiates

9    for revenue sharing.  I don't think there's anything in

10   the record to support that, and the evidence in the record

11   states the opposite.  It states that sometimes revenue

12   sharing goes up and sometimes it goes down.  It goes down

13   more than it goes up, and there's lots of testimony from

14   Mr. Wietsma which says that MassMutual does not negotiate

15   revenue sharing.  It's set by the mutual funds and so I

16   think that statement does not comport with the evidence in

17   the record.

18        Finally the PERA account, I don't think there's any

19   rational explanation for why PERAS have been excluded from

20   this case.

21        When MassMutual sets up a PERA, which is going to be

22   asked for by the trustee and/or the advisor, it does so

23   usually, but not always, when the revenue sharing amount

24   exceeds the negotiated fee.  But all that does is enhance

25   the point that MassMutual offsets in every instance in its

1    pricing memoranda the revenue sharing to be received

2    against payments that would have to be paid directly by

3    the plan or the plan participants.

4        It just happens that in a non-PERA situation you

5    still need some money beyond the revenue sharing in order

6    to meet the negotiated fee amount.  I would add that there

7    are PERAS set up and they can be set up even when there's

8    not an excess of revenue sharing over the requested fees.

9            THE COURT:  I guess one of the things -- this is

10   probably irrelevant.  My dad was a CFO of a fairly large

11   corporation and I talked to him about this.  If it's a

12   wash, why take anything from the mutual funds?  Why go

13   through all this accounting rigmarole?

14       In other words, it just seems like an awful lot of

15   work for nothing.  You get the money from the mutual funds

16   for the investments that you make of the funds belonging

17   to Golden Star and your other clients and then you give it

18   back to them through the PERAS or through the offsets of

19   your fees.

20       Why not just get your fees from your clients like

21   Golden Star and say thank you very much for the mutual

22   funds and say don't bother to give us this money because

23   it's not going to help us at all.  It's just going to be a

24   plus and minus on our balance sheets and it's a pain in

25   the neck.  You know, what's going on here?  It doesn't

1    make sense.

2              MR. FELDMAN:  It's a good question and two

3    responses.  First, the fact that you noticed a wash is

4    critical because if revenue sharing was eliminated, all

5    that would happen is the same money would be received

6    directly from the plan or the plan participants, but the

7    reason that revenue sharing exists I think was pretty well

8    covered in the background section in the Seventh Circuit

9    opinion of *AUL* and Professor Muir, our expert witness's

10   report.  It's really historical evolution.

11        When service providers like American United Life or

12   MassMutual or Principal Financial or Hartford or even

13   Fidelity, when they entered the 401(k) retirement market

14   in the early '90s, ultimately what they wound up doing was

15   taking over massive administrative tasks that would have

16   been performed and were being performed by the mutual

17   funds themselves.

18        If there's a hundred thousand customers in a

19   particular mutual fund that's serviced by MassMutual,

20   MassMutual does all that paperwork and a hundred thousand

21   individuals are not serviced in any real way by the mutual

22   fund itself, and so that's why those payments began by the

23   mutual funds.  It was for payment of services that they

24   normally would have performed that were now being

25   performed by the service providers and *AUL* in the Seventh

1    Circuit opinion notes that expressly at page 5.

2           THE COURT:  Okay.  Well, I hear you and I'm a

3    little regretful that so much has gone into the issue of

4    class certification.

5        I certainly am not surprised to hear Mr. Feldman

6    argue that even if we lose on the fiduciary issue and Mr.

7    Miller is correct that we are a fiduciary, there are

8    hurdles that we think the plaintiffs won't be able to

9    clear.  The plaintiffs are confident that they will be

10   able to clear them, but I'd like frankly to get this what

11   I think of as fairly substantial threshold issue resolved

12   one way or another first and then from there move on to

13   the class certification issue.

14       I don't want to predict what my ruling might be

15   because I honestly don't know what it is or will be, but

16   it seems to me that if MassMutual wins on the fiduciary

17   issue, it's going to be much tougher for Golden Star to

18   persuade me that they are an appropriate class

19   representative.

20       If Golden Star wins on the fiduciary issue, they're

21   going to be in a far stronger position to persuade me that

22   they should be the class representative here and the class

23   action is in an appropriate form to go forward, and I'd

24   like to focus on that much narrower issue to begin with.

25   So that's what I think we'll do.

1           Now the next question I have is how much time do you

2      think that you'll need -- well, I have two questions.

3      First of all, is there anything else that anybody wants to

4      say on that?  You're probably not going to change my mind,

5      but there might be some refinements or modifications of

6      the approach that you might suggest and I would be happy

7      to hear those.

8           Then my second question is how much longer do you

9      think you will need to wrap up discovery so that both of

10     you are in a position to take a fair shot at this issue

11     and come back here and try to convince me with regard to

12     the fiduciary question?

13           MR. MILLER:  Your Honor, if it's acceptable to

14     you and to MassMutual, I would suggest that we just be

15     given an opportunity to meet and confer and submit a

16     proposed schedule.  We've held off on doing any electronic

17     discovery pursuant to search terms because we wanted to

18     get to this point first.  I think we may have some issues

19     to discuss to figure out a sensible time frame that makes

20     sense for everyone.

21           THE COURT:  Can you get me a proposed agreed

22     schedule or your separate schedules if you can't agree, I

23     hope you can agree but we'll leave that open, say within

24     three weeks?  Would that be enough time for you to do

25     that?

1          MR. FELDMAN:  Certainly, Your Honor.

2          THE COURT:  So that's what I think I'm going to

3   do.

4       I'm going to deny the motion for class certification

5   without prejudice.  I'm going to deny the motion to strike

6   the expert report without prejudice.

7       I'm going to ask you to submit to me by May 17th a

8   proposed schedule for completion of discovery on the

9   question of MassMutual's fiduciary status, and then that

10  schedule will include a proposal for the discovery phase,

11  filing of motions, oppositions, replies, sur-replies, and

12  a ballpark suggestion for when you might be coming back

13  for argument.  That's the approach that I feel most

14  comfortable with and I appreciate your patience with me.

15      I know we have a lot of people here that have worked

16  very hard on this.  Everybody got their suit cleaned and

17  they're all ready to argue about class certification and

18  we're ready to go, but unfortunately this is the way I

19  think I feel more comfortable doing it.  I appreciate it

20  and I'll look forward to the schedule that you will be

21  submitting.  All right.

22          MR. MILLER:  Thank you, Your Honor.

23          MR. FELDMAN:  Thank you very much, Your Honor.

24          THE COURT:  Thank you.  Court's in recess.

25  **(Court recessed at 12:52.)**

1                  C E R T I F I C A T E

2

3

4        I, Alice Moran, Official Federal Court Reporter for

5   the United States District Court for the District of

6   Massachusetts, do hereby certify that the foregoing is a

7   correct transcript from the record of proceedings in the

8   above-entitled matter.

9

10

11

12                    /s/ Alice Moran

13        ————————————————————

14                  Dated May 1, 2013

15              Alice Moran, CSR, RPR, RMR

16             Official Federal Court Reporter

17              300 State Street, Room 303D

18                Springfield, MA 01105

19                    413-731-0086

20              alice.moran@verizon.net

21

22

23

24

25