# Exhibit 25

```
 1            IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF MASSACHUSETTS
 2

 3   CONFIDENTIAL
                                        Civil Action
 4                                      No. 3:11-CV-30235-MAP

 5
     GOLDEN STAR, INC., Plan Administrator of the Golden
 6   Star Associates' 401(k) Plan and the Golden Star
     Bargaining Associates' 401(k) Plan, On Behalf of
 7   Itself and All Others Similarly Situated

 8   VS

 9   MASS MUTUAL LIFE INSURANCE CO.

10

11

12            Videotaped Deposition of: ERIC WIETSMA, taken

13   pursuant to Rule 30(b)(6) of the Federal Rules of

14   Civil Procedure before Barbara L. Murphy, Certified

15   Shorthand Reporter and Notary Public within and for

16   the Commonwealth of Massachusetts, held at the offices

17   of Bulkley, Richardson and Gelinas, 1500 Main Street,

18   Springfield, Massachusetts on October 1, 2013

19   commencing at 9:05 a.m.

20

21
              DEL VECCHIO REPORTING SERVICES, LLC
22              PROFESSIONAL SHORTHAND REPORTERS
                        117 RANDI DRIVE
23                     MADISON, CT 06443
                        (203)245-9583
24                      (203)245-2760

25   STAMFORD            HARTFORD            NEW HAVEN
```

1   publicized relationship with Lance Armstrong.  So they
2   actually named their target date series the Livestrong
3   funds.  They have miraculously changed that name.
4       Q.   They decided to revisit that?
5       A.   They revisited it and now they're called
6   something else.  But at this particular time, they
7   were -- that's the term or the shorthand that they
8   would use to refer to the target date series that
9   American Century manufactured.
10      Q.   Okay.  And so when -- it says, my input to
11  both is that to turn Livestrong on as a core target
12  date QDIA option in Smart Arch means we have to turn
13  off the T. Rowe Price target date options.
14           Do you see that?
15      A.   I do see that.
16      Q.   And what's your -- do you have an
17  understanding as to what Mr. Eldredge was referencing
18  when he made that statement?
19      A.   So what Mike is talking about is typically
20  when we -- if we make changes to what is put on to the
21  Smart Architecture list, that is a prospective change
22  only.
23           So what Mike is suggesting that if we were to
24  add another target date series to the Smart
25  Architecture list, in this case the American Century

1   Livestrong funds, rather than simply just have Smart
2   Architecture continue to grow and this is definitely
3   art versus science, his suggestion would be that we
4   would take the T. Rowe options and take them off of
5   Smart Architecture prospectively.
6       So that would not change anything for any
7   investor who invested in T. Rowe today, it would
8   simply be for the next new client that comes in the
9   door when they look at Smart Architecture, they would
10  see Livestrong as one of the options.  They would not
11  see T. Rowe.
12      Q.   And that goes back to what you were saying
13  earlier is the purpose of Smart Architecture from Mass
14  Mutual's standpoint is to provide certain fund options
15  on the platform but to do so in a manageable way; is
16  that correct?
17      A.   Yes.  Smart Architecture serves as a
18  starting point for plan sponsors and advisors to build
19  their lineups.
20      Q.   So the suggestion here was if this
21  Livestrong fund was going to be added, that it would
22  make sense or that it would be -- the thought was then
23  to prospectively take off the T. Rowe Price from the
24  platform, from the Smart Architecture platform,
25  correct?

1   A.   That was a suggestion from Mike in his role
2   as an investment person.
3   Q.   Okay.  And so let's just talk a little bit
4   about the mechanics of -- I guess first and foremost
5   do you know whether or not this actually was carried
6   out?
7   A.   I believe that American Century did
8   ultimately get added to Smart Architecture, the
9   Livestrong fund.
10       I'm not sure Mike's suggestion was followed.
11  So I think the T. Rowe funds continued to stay
12  available as well.
13  Q.   Just from a procedural or mechanic's
14  standpoint, let's assume for the moment that this
15  recommendation had been accepted by Mass Mutual, okay?
16  A.   Okay.
17  Q.   So as I understand it how it would work,
18  correct me if I'm wrong, is that if T. Rowe Price had
19  been turned off as an option, right, and you
20  understand what I mean by that?
21  A.   I do.
22  Q.   That if a plan had invested in T. Rowe Price
23  up through the point when it was turned off, that they
24  would continue to have that fund available to them; is
25  that correct?

 1       A.   That would be correct.  The plan itself
 2  would be unaffected by any changes to Smart
 3  Architecture going forward.
 4       Q.   Okay.
 5       A.   It would simply be a new sale item.
 6       Q.   But if there was a plan that had not
 7  invested in T. Rowe Price up to that point, then that
 8  would no longer be available to them on the platform;
 9  is that correct?
10       A.   It would be -- in this particular case, it
11  would be not featured in the Smart Architecture
12  starting point.
13            An advisor and sponsor who were wed to T.
14  Rowe Price and wanted that option, would still be able
15  to get it.
16            Operationally it would not be unavailable, it
17  just would not be included as part of the starting
18  point.
19       Q.   It wouldn't be on the platform of funds on
20  the Smart Architecture, correct?
21       A.   Yeah.  It would be more -- it would then
22  become an exception to offer it.
23       Q.   And with respect to -- is that kind of
24  referred to as a soft close?  Is that a term that
25  you've heard used within Mass Mutual?

```
 1   BY MR. SHAH:
 2       Q.   Mr. Wietsma, you've been handed a document
 3   that's been marked as Exhibit 8.
 4            The top of the E-mail chain is a January 11,
 5   2010 E-mail from Jim Collins to Mr. Silvanic and to
 6   you.
 7            Do you recognize this E-mail string?
 8       A.   Vaguely, yup.
 9       Q.   And I apologize if I already asked this on a
10   previous exhibit but who is Jim Collins?
11       A.   Jim Collins is retired now.  Jim was an
12   actuary who worked in the retirement services business
13   prior to retiring several years ago.
14       Q.   And who is Mr. Silvanic, William Silvanic?
15       A.   Bill Silvanic is our chief financial
16   officer.  So he's part of the senior leadership team
17   of retirement services.
18       Q.   Okay.  What's the dividends received
19   deduction?
20       A.   Dividend received deduction is part of the
21   tax code.  So it is a tax deduction that one can
22   receive credit for dividends that are paid down from
23   parent companies to subsidiaries and it's designed to
24   avoid double taxation.
25       Q.   That's your understanding?
```