## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| GOLDEN STAR, INC.,<br>Plan Administrator of the Golden<br>Star Associates' 401(k)Plan and the<br>Golden Star Bargaining Associates'<br>401(k)Plan, On Behalf of Itself and<br>All Others Similarly Situated<br><br>        Plaintiff,<br><br>  v.<br><br>MASS MUTUAL LIFE INSURANCE CO.,<br><br>        Defendant. | CIVIL NO. 3:11-30235-PBS |

### MEMORANDUM AND ORDER

May 20, 2014

SARIS, Chief Judge,

### INTRODUCTION

Golden Star, Inc. ("GSI"), the named fiduciary and sponsor of two 401(k)[1] plans, brings this proposed class action[2] alleging that the plan service provider MassMutual Life Insurance Company ("MassMutual") violated the Employment Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq. when it received revenue

---

[1] 401(k) plans are private, employer based defined-contribution retirement plans that meet the requirements of Internal Revenue Code Section 401(k), 26 U.S.C. § 401(k).

[2] The judge to whom this case was previously assigned ordered the parties to brief the issue of whether MassMutual is a fiduciary under ERISA before he decided the issue of class certification.

1

sharing payments from third-party mutual funds.  GSI alleges that these payments were essentially "kickbacks" that constituted prohibited transactions under ERISA, 29 U.S.C. § 1106(b), and violated the fiduciary duties imposed by the statute, 29 U.S.C. § 1104(a)(1). MassMutual has moved for summary judgment solely on the question of whether it qualifies as a "functional fiduciary" within the meaning of ERISA, 29 U.S.C. § 1002(21)(A) with respect to revenue sharing. After hearing, MassMutual's motion for summary judgment is **DENIED**.

## I. FACTUAL BACKGROUND

The following facts are undisputed, except where noted. All reasonable inferences are drawn in favor of the non-moving party, GSI.

GSI is a Kansas City-based manufacturer and distributor of floor maintenance products, which offers its employees two 401(k) plans (the "Plans"). GSI is the plan administrator and named fiduciary of the Plans. The Plans also hired a third-party plan administrator.

Since 1993, MassMutual, an insurance company, has provided the Plans with services, which include designing and maintaining an "Overall Menu" of investment options, such as mutual funds, and recordkeeping. The Plans select which investment options to offer participants as the "Plan Menu". Plan participants do not directly invest in the mutual funds. Instead they invest in

separate accounts owned by MassMutual, several of which invest in the shares of a single fund. MassMutual states that some of the funds are owned by third parties, while some are MassMutual proprietary funds. The use of separate accounts enables MassMutual to keep retirement contributions separate from other assets, as required by ERISA and state law.[3]

MassMutual and GSI have entered into a Group Annuity Contract ("GAC") that provides that MassMutual legally owns these "Separate Investment Accounts." Assise Aff. Ex. 23, at 40 (§ 5.22). The GAC states that MassMutual has "exclusive and absolute ownership and control" of the assets in the Separate Investment Accounts, and that "[a]ll assets of MassMutual are invested by MassMutual as it, in its sole discretion, may determine, subject to applicable laws and regulations including, but not limited to, the discontinuance of a Separate Investment Account." Id. MassMutual retains the right to add, delete, or substitute the investment options offered on the Overall Menu.  Since 2005,[4] MassMutual has added several investment options to the Overall Menu. During the same period, GSI also requested several changes

---

[3] A helpful description of the use of separate investment accounts for purposes of investing 401(k) contributions is provided in Leimkuehler v. Am. United Life Ins. Co., 713 F.3d 905, 908-09 (7th Cir. 2013).

[4] This lawsuit was filed in October 2011. See 29 U.S.C. § 1113(1) (providing six-year statute of repose).

3

to the Plan Menu, which MassMutual made at the direction of GSI's plan administrators. Pl.'s Statement of Facts ¶ ¶ 48-49.

To compensate MassMutual for its services, plan sponsors may make payments to MassMutual, or MassMutual may charge fees to plan participants. The GAC with GSI permits MassMutual to assess Separate Investment Account management fees ("SIA management fees"), and to set the fees at a rate up to 1.0% of the average daily market value of the separate account. Assise Aff. Ex. 23, at 28 (§ 2.04(c)(xi)). It is unclear whether MassMutual has charged SIA management fees on all of its separate accounts.

MassMutual states that it enters into "Participation" or "Services Agreements" with the third-party mutual funds before placing them on its Overall Menu, but GSI disputes this because MassMutual was unable to produce the agreements for certain funds during discovery. The Participation Agreements provide for MassMutual's receipt of so-called "revenue sharing payments" ("RSPs") based on the "expense ratio" charged by the mutual funds for the separate accounts. Some "share classes"[5] have higher "expense ratios" than other "share classes," resulting in higher RSPs. When RSPs go up (it is disputed how often), GSI states that MassMutual keeps the increased fees. However, there is no

---

[5] While the terms "share classes" and "expense ratios" are not well explained, the record indicates that different share classes have different pricing structures. It is unclear when share classes are determined, but GSI asserts that MassMutual retains the ability to change them.

evidence there was an increase in fees for any option on the GSI
Plan Menu. It is disputed whether MassMutual provides additional
services to mutual funds in exchange for the RSPs that it
wouldn't otherwise provide as owner of the separate accounts.
GSI contends the amount of RSPs is largely unrelated to services
and is really a "pay-to-play" payment by the third-party mutual
fund to gain access to the retirement Plans. MassMutual asserts
that it has disclosed the existence of RSPs to GSI since 2008,
but GSI states that MassMutual did not do so until 2010.

According to MassMutual, RSPs are used to offset the fees
and other payments it would otherwise collect from the GSI Plan
or its participants as compensation for management of the
separate accounts. Plaintiffs deny there is a dollar for dollar
offset. The Department of Labor has provided guidance regarding
RSPs, which suggests that receipt of RSPs by plan servicers does
not violate ERISA if the payments are disclosed to plans and are
used to offset payments from those plans. See Department of Labor
Pension & Welfare Benefit Programs, Op. 97-15 A, 1997 ERISA LEXIS
18, at *12 (May 22, 1997) ("Frost Letter") (expressing opinion
that plan service provider's receipt of RSPs did not violate
ERISA because the provider's "agreements with the Plans are
structured so that any [RSPs] attributable to the Plans'
investments in mutual funds are used to benefit the Plans, either
as a dollar-for-dollar offset against the fees the Plans would be

obligated to pay . . ., or as amounts credited directly to the Plans"). MassMutual's disclosure and use of the RSPs involve disputed factual issues at the heart of this case.

## II. DISCUSSION

### A. Standard of Review

Summary judgment is appropriate where "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Barbour v. Dynamics Research Corp., 63 F.3d 32, 36-37 (1st Cir. 1995) (quoting Fed.R.Civ.P. 56(c)). "A 'genuine' issue is one that must be decided at trial because the evidence, viewed in the light most flattering to the nonmovant, . . . would permit a rational factfinder to resolve the issue in favor of either party." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted).

To prevail on the motion, "the moving party must show that there is an absence of evidence to support the nonmoving party's position." Rogers v. Fair, 902 F.2d 140, 143 (1st Cir. 1990). If the movant satisfies this burden, the burden shifts to the nonmoving party to produce "sufficient evidence . . . for a jury to return a verdict [in its favor.]" Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

**B. Fiduciary Status**

The key issue is whether MassMutual was acting as a fiduciary when it received revenue sharing payments in connection with its management of the Separate Investment Accounts. ERISA "extends fiduciary liability to functional fiduciaries – – persons who act as fiduciaries (though not explicitly denominated as such) by performing at least one of several functions with respect to a plan." Beddall v. State Street Bank & Trust Co., 137 F.3d 12, 18 (1st Cir. 1998). Under the statute a person is a fiduciary "with respect to a plan to the extent

> (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets,
> (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or
> (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21)(a). Congress intended that the term "fiduciary" be "broadly construed." Finkel v. Romanowicz, 577 F.3d 79, 86 (2d Cir. 2009) (citation omitted). This statutory definition is functional, not status-based. Id. (holding that one's status as an officer did not make him a ERISA fiduciary because he did not manage 401(k) Plan assets).

Prong one of subsection (i) provides that a person is a fiduciary of an ERISA Plan to the extent "he exercises any

discretionary authority or discretionary control respecting management of such [a] plan." One touchstone of whether a person qualifies as a functional fiduciary is whether that "person exercises discretionary authority in respect to, or meaningful control over, an ERISA plan, its administration, or its assets (such as by rendering investment advice)." Beddall, 137 F.3d at 18. The "mere exercise of physical control or the performance of mechanical administrative tasks" does not necessarily trigger fiduciary duties. Id. (holding that the bank trustee of a relevant plan was not a fiduciary in regard to real estate interests because it performed only administrative and ministerial functions); see also Cottrill v. Sparrow, Johnson, & Ursillo, Inc., 74 F.3d 20, 21-22 (1st Cir. 1996)(holding that a person did not come within the ambit of subsection (i) merely by following the authorization of the Plan's named trustee to collect and to invest $130,000 in a group of mortgages).

Prong two of subsection (i) is worded differently. It provides that a person is a fiduciary of a plan to the extent he "exercises any authority or control respecting management or disposition of its assets." (Emphasis added). Notice that the word "discretion" is missing. Equally significantly, a person can be a fiduciary of a plan even if he does not have "discretion or control respecting management of such plan" if he "exercises any authority or control respecting management or disposition of its

8

assets." <u>See</u> <u>Harris Trust & Sav. Bank v. John Hancock Mut. Life</u>
<u>Ins. Co.</u>, 302 F.3d 18, 28 (2d Cir. 2002) ("The 'management or
disposition' language . . . refers to the common transactions in
dealing with a pool of assets [including] selecting
investments.") (quoting <u>Johnson v. Georgia-Pacific Corp.</u>, 19 F.3d
1184, 1189 (7th Cir. 1994)). Some circuits have held that the
exercise of <u>any</u> authority or control – discretionary or not –
over management and disposition of plan assets satisfies prong
two of subsection (i). <u>See e.g.</u>, <u>Leimkuehler v. Am. United Life</u>
<u>Ins. Co.</u>, 713 F.3d 905, 913 (7th Cir. 2013) ("[I]nsofar as
'management or disposition of assets' is concerned, there is no
separate requirement of <u>discretionary</u> authority or control.")
(emphasis added); <u>Briscoe v. Fine</u>, 444 F.3d 478, 493 (6th Cir.
2006) (holding that a party with contractually limited discretion
was a functional fiduciary because he possessed and used the
power to write checks on the ERISA plan account). These cases may
be perceived as being in tension with <u>Beddall</u>, in which the First
Circuit broadly uses "discretion" as the touchstone for
qualification as a functional fiduciary under subsection (i), but
<u>Beddall</u> was not addressing arguments highlighting differences
between the wording of the two prongs of the subsection.

Both prongs of subsection (i) of the functional fiduciary
definition require the actual "exercise" of authority or control
– mere possession of authority is insufficient. Some courts have

9

interpreted "exercise" to mean an affirmative act rather than an omission. See Trustees of the Graphic Communc'ns Int'l Union Upper Midwest Local 1M Health & Welfare Plan v. Bjorkedal, 516 F.3d 719, 733 (8th Cir. 2008) (holding that primary shareholder's failure to ensure that company employee and employer premiums were paid to ERISA plan did not constitute "exercise" of authority: "[a]n act of omission fails to satisfy the requirement that the individual exercise discretionary authority over plan assets"); Leimkuehler, 713 F.3d at 914 (citing Bjorkedal, holding that insurance company's failure to invest ERISA plan assets in less expensive mutual fund share classes did not make the company a functional fiduciary under subsection (i)).

GSI also claims that MassMutual is a fiduciary under subsection (iii), which provides that a person is a fiduciary to the extent "he has any discretionary authority or discretionary responsibility in the administration of such Plan." A plan administrator is a statutorily defined position. See 29 U.S.C. § 1002(16)(A). However, a person, even an outsider, may function as a fiduciary under subsection (iii) even if not a "named" plan administrator. In some circumstances,  subsection (i) and subsection (iii) can have overlapping coverage. The Second Circuit has noted that "[s]ubsection one imposes fiduciary status on those who exercise discretionary authority, regardless of whether such authority was ever granted, [while] [s]ubsection

three describes those individuals who have actually been granted discretionary authority, regardless of whether such authority is ever exercised." <u>Bouboulis v. Transp. Workers Union of Am.</u>, 442 F.3d 55, 63 (2d. Cir. 2006) (quoting <u>Olson v. E.F. Hutton & Co., Inc.</u>, 957 F.2d 622, 625 (8th Cir. 1992)) (holding that a labor union was a functional fiduciary to a plan under subsection (iii) due to its position as Plan Administrator and its authority to decide whether participants could appeal adverse decisions on their claims). The Supreme Court has interpreted the term "administration" in subsection (iii) to mean acting with "such powers as are necessary or appropriate for the carrying out the purposes" of the Plan. <u>Varity Corp. v. Howe</u>, 516 U.S. 489, 502 (1996) (internal quotation marks omitted). While "fiduciary duties draw much of their content from the common law of trusts," the law of trusts will not necessarily determine the outcome of an effort to interpret ERISA's fiduciary duties. <u>Id.</u> at 496.

MassMutual contends that "administration" of a plan under subsection (iii) involves only those activities concerning eligibility, and the determination of whether a participant is entitled to benefits. While plan administration certainly includes these activities, MassMutual has provided no caselaw to support its contention that the definition is so limited. It is significant, though, that subsection (iii) does not deal with "management or disposition of [plan] assets," which is covered by

11

subsection (i). One court has adopted a "fairly broad definition of plan administration," concluding that the contractual right to substitute investment options in the Plan Menu made the service provider eligible for fiduciary status under subsection (iii). See Healthcare Strategies, Inc. v. ING Life Ins. & Annuity Co., 961 F. Supp. 2d. 393, 401-02 (D. Conn. 2013) (Young, J.). The eligibility of service providers for fiduciary status under subsection (iii) is an undeveloped area of the law.

A person is a functional fiduciary "only 'to the extent' that he possesses or exercises the requisite discretion or control." Beddall, 137 F.3d at 18. Because the definition's "to the extent" limitation requires some nexus between the alleged ERISA violation and the actions or functions that have created fiduciary status: "fiduciary liability arises in specific increments correlated to the vesting or performance of particular fiduciary functions in service of the plan, not in broad, general terms." Id. Thus, in any case where a plaintiff alleges violation of ERISA's fiduciary duty or prohibited transaction provisions, the threshold question is whether the defendant "was acting as a fiduciary . . . when taking the action subject to complaint." Pegram v. Herdrich, 530 U.S. 211, 226 (2000).

ERISA § 404 imposes on fiduciaries both a duty of care and a duty of loyalty. Fiduciaries must "employ within the defined domain 'the care, skill, prudence, and diligence under the

12

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use,'" Beddall, 137 F.3d at 18 (citing 29 U.S.C. § 1104(a)(1)(B)), and should act "solely in the interest of the participants and beneficiaries." 29 U.S.C. § 1104(a)(1). ERISA fiduciaries are also subject to the prohibited transactions provision at ERISA § 406(b), which states that a fiduciary shall not: "1) deal with the assets of the plan in his own interest or for his own account, 2) . . . act in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the interests of the plan or . . . its participants or beneficiaries, or 3) receive any consideration for his own personal account . . . in connection with a transaction involving the assets of the plan." 29 U.S.C. § 1106(b).

Once a person is established as a fiduciary to a plan, the Second and Ninth Circuits have held that the person accused of a § 406(b) violation bears the burden to "prove by a preponderance of the evidence that the transaction in question fell within an exemption [from the provision], or [to] prove by clear and convincing evidence that compensation it received was for services other than a transaction involving the assets of a plan." Lowen v. Tower Asset Mgmt., Inc., 829 F.2d 1209, 1215 (2d Cir. 1987) (citation omitted); see also Howard v. Shay, 100 F.3d 1484, 1488 (9th Cir. 1996). The First Circuit has not yet

addressed burden-shifting under the prohibited transactions
provision.

## C. Plaintiff's Fiduciary Theories

GSI argues that MassMutual satisfies subsection (i) of the
functional fiduciary definition by exercising authority in the
following ways: a) setting SIA management fee rates and drawing
the fees from the separate investment accounts; b) re-investing
mutual fund dividends generated by the separate accounts; c)
changing the investment options available to the GSI Plan on the
Overall Menu; d) failing to offer lower cost share classes in
mutual fund investment options; and e) owning the separate
accounts and investing the GSI Plan assets in mutual funds.
Further, GSI contends that MassMutual is a functional fiduciary
under subsection (iii) because it possesses discretionary
authority with regard to several of these aspects of the plan,
even if that authority is never exercised. Specifically, GSI
argues that MassMutual has discretionary authority or control
over SIA management fees and mutual fund investment options on
the overall menu, and because of its ownership and administration
of the separate accounts. Finally, GSI argues that MassMutual's
authority to render investment advice to the Plan renders it a
fiduciary under subsection (ii) of the statutory definition.

MassMutual does not contest the fact that it owed some
fiduciary duties to the Plans, but argues it was not a fiduciary

14

"to the extent" it received revenue sharing payments.  It contends that many of GSI's theories are invalid because the conduct that makes MassMutual a fiduciary has nothing to do with revenue sharing.

## D. SIA Management Fees

GSI argues that MassMutual's ability to set the rate of Separate Investment Account (SIA) management fees and draw them directly from separate accounts renders MassMutual a fiduciary with respect to revenue sharing. Under the GAC, MassMutual can charge GSI a "separate investment account management fee," that consists of a "daily rate which on an annual basis does not exceed 1.0% of the average daily Market Value of the applicable Separate Investment Account." MassMutual determines where in the range of 0.0 to 1.0% the fee percentage rate will be set.

MassMutual does not contest that it exercises its discretion to set and draw fees from certain separate accounts. However, it contends it never "altered" the SIA management fee on any accounts.

The overall discussion of fees in the record is impenetrable. Peter Demetriou, the MassMutual investment platform manager, testified MassMutual never changed the management fee associated with separate accounts involving a pool of securities. Demetriou Dep. 70:25-71:8, Oct. 2, 2013. However, the SIAs in this litigation invest in single mutual funds, not a pool of

securities. Defendant's employee Tina Wilson testified that
MassMutual has never changed the basis point amount of a "wrap
fee" for separate investment accounts. Wilson Dep. 33:25-34:4,
Oct. 1, 2013. However, MassMutual does not explain what a "wrap
fee" is. Eric Wietsma, of MassMutual, testified that a "wrap fee
and an SIA management fee" are different but "mechanically they
operate very similarly." Wietsma Dep. 99:11-20, Oct. 1, 2013. So
for some SIAs, MassMutual gets some fees under the participation
agreements, but some SIAs have share classes with "an additional
wrap fee or asset management fee." Wietsma Dep. 100:3-5.  Wietsma
explained: "[I]f an SIA has as its investment objective to own an
underlying mutual fund . . . there is always the ability to add
different levels of asset based fees to create more options for
sponsors and advisors to offset their administrative expenses. So
if a share class is paying 35 basis points and you wanted to
create a fifty, sixty, eighty, 90 basis point option, you can
simply add that differential in an asset based fee and it's
inside of the SIA." Wietsma Dep. 101:2-14. This "asset based fee"
appears to be different from a "wrap fee" or a "revenue sharing
fee." Wietsma Dep. 101:21-102:3. This is not fee simple.  When
all reasonable inferences are drawn in favor of the non-moving
party, there is a disputed issue of fact as to when and how
MassMutual determines its compensation for each SIA involving a
single mutual fund.

The caselaw is clear that a service provider's retention of discretion to set compensation can create fiduciary duties under ERISA with respect to its compensation. Generally speaking, a service provider "does not act as a fiduciary with respect to the terms in the service agreement if it does not control the named fiduciary's negotiation and approval of those terms." Hecker v. Deere & Co., 556 F.3d 575, 583 (7th Cir. 2009) (citing cases); Santomenno v. John Hancock Life Ins. Co., Civ. No. 2:10-cv-01655, 2013 WL 3864395, at *7 (D.N.J. July 24, 2013) (holding that service provider was not a fiduciary with respect to revenue sharing because the total expenses associated with each investment option were fully disclosed). However, "after a person has entered into an agreement with an ERISA-covered plan, the agreement may give it such control over factors that determine the actual amount of its compensation that the person thereby becomes an ERISA fiduciary with respect to that compensation." F.H. Krear & Co. v. Nineteen Named Trustees, 810 F.2d 1250, 1259 (2d Cir. 1987). Consistent with this caselaw, one court has held that a bank that offered and managed funds was a fiduciary with regard to its compensation because its contract with the ERISA plan allowed it to charge a lending fee "anywhere from 0% to 50%," which constituted "significant discretionary authority" to determine the amount of its compensation. Glass Dimensions, Inc., ex rel. Glass Dimensions, Inc., Profit Sharing Plan & Trust v.

17

State Street Bank & Trust Co., 931 F. Supp. 2d 296, 304 (D. Mass. 2013). Another Court in this District reached a similar conclusion where the contract with a 401(k) plan set a maximum administrative maintenance charge that could be levied on each investment sub-account, and within the range up to the maximum, defendant "had the sole authority to set the . . . charge." Charters v. John Hancock Life Ins. Co., 583 F. Supp. 2d 189, 197 (D. Mass. 2008). The court held: "Because the contract gave Hancock discretionary authority over its fees it acquired a fiduciary status with respect to those fees." Id. The court denied a motion for summary judgment because there was a disputed issue of fact as to whether the insurer claimed that it "applied [RSPs] to reduce the administrative maintenance charge" it levied on the plan. Id. at 200 (citing Frost Letter, 1997 ERISA LEXIS 18, at *4).

In the instant case, MassMutual had the discretion to unilaterally set fees up to a maximum and exercised that discretion. MassMutual asserts that its compensation may come from any combination of three sources: (a) fees charged to plan participants, (b) direct payments from the plan sponsor, or (c) revenue sharing payments from mutual funds. MassMutual explains, "By way of example, if MassMutual, in the pricing process, determines it needs $100,000 to service a plan, and it projects it will receive $50,000 in revenue sharing, then the Plan can

have MassMutual directly bill the Plan sponsor or the Plan participants for the other $50,000." Def.'s Mem. in Supp. of Mot. for Summ. J., at 5. While the mechanics of the "pricing process" are unclear in the record, as stated earlier, it appears that MassMutual exercises the discretionary authority to determine its own compensation by setting SIA management fees (up to a maximum), which in combination with RSPs, make up the compensation package. A reasonable fact-finder could determine that MassMutual functions as an ERISA functional fiduciary under subsection (i) to the extent it determines its own compensation, takes fees out of the separate accounts, and has the discretion to offset some or all of the RSPs against management fees as its compensation.

In addition, Plaintiffs argue that MassMutual's services to the Plan (like sending out checks to plan members or reinvesting dividends) fall within the definition of "administration of the plan," triggering fiduciary status under subsection (iii) as well. To the extent MassMutual has discretionary control over factors governing its fees after entering into its agreement with GSI for administration of the Plan, subsection (iii) is implicated as well.

**E. Changing Investment Options on Overall Menu**

GSI argues that MassMutual's contractual authority to add, delete, or substitute the mutual funds available on the Plan Menu

19

(and therefore influence the amount of revenue sharing) makes it eligible for functional fiduciary status, even if that authority was never exercised as a matter of MassMutual's discretion. Because the parties have briefed this issue so extensively, I address it.

MassMutual argues that many of GSI's theories fail because they rely on subsection (iii) of ERISA's definition of fiduciary, which in its view, is not applicable to actions relating to the investment of plan assets. The Department of Labor has expressed the view that under ERISA, "the act of limiting or designating investment options which are intended to constitute all or part of the investment universe of an ERISA 404(c) plan is a fiduciary function," Frost Letter, 1997 ERISA LEXIS 18, at *11 n.9, but that plan servicers may avoid fiduciary status "provided that the [Plan] in fact makes the decision to accept or reject" changes to the overall menu that affect existing plan investments. Department of Labor Pension & Welfare Benefit Programs, Op. 97-16 A, 1997 ERISA LEXIS 17, at *15 (May 22, 1997). To meet that standard, the DOL states that a Plan must receive "advance notice of the change, including any changes in the fees received, [be] afforded a reasonable period of time within which to decide whether to accept or reject the change and, in the event of a rejection, secure a new service provider." Id. These measures would indicate that the Plan has the final authority on which

investment options are available, which is the key factor that courts have focused on when addressing this theory of fiduciary status.

In Hecker v. Deere, the Seventh Circuit held that without other indicia of discretionary control, the power to limit the universe of funds available to a Plan by adding to or subtracting from an overall menu does not confer fiduciary status on a plan servicer. See Hecker, 556 F.3d at 583. In Hecker, an investment services company offered a 401(k) plan a limited menu of investment options. Because the parties' contract expressly gave the plan the "final say" on which investment options would be included, the court held that the investment services company was not a fiduciary: "no authority . . . holds that limiting funds automatically creates discretionary control sufficient for fiduciary status." Id. The Court reaffirmed that conclusion in Leimkuehler, rejecting arguments that Plan servicers met the requirements of subsection (i) of the functional fiduciary definition by selecting which mutual fund share classes to include on the investment menu offered to a 401(k) plan; by exercising authority or control over the management and disposition of plan assets in the separate accounts because that task had nothing to do with the alleged breach of fiduciary duty; and by reserving the right to substitute or delete funds made available to the Plan participants for the same reason. 713 F.3d

at 911-12. It is worth noting that in <u>Leimkuehler</u>, the Seventh
Circuit only addressed the fund-substitution theory under
subsection (i) of the functional fiduciary definition, and
attributed the theory's failure in part to the fact that the plan
service provider had never exercised the power to substitute the
funds on the menu. However, the Court still acknowledged the
analytical significance of whether the Plan had the ultimate
authority over investment option substitutions: "[The Plan
Servicer] reserves the right to make substitutions to the funds
that [the Plan Trustee] chooses to offer Plan participants, and
thus there is at least some basis for questioning whether [the
Plan Servicer] has 'the final say on which investment options
will be included.' But Leimkuehler concedes that [the Plan
Servicer] has never exercised this contractual right in a way
that could give rise to a claim." <u>Id.</u> at 911 (quoting <u>Hecker</u>, 556
F.3d at 583); <u>see also</u> <u>Santomenno</u>, 2013 WL 3864395, at *7
(holding that service provider which offered a "big menu" of
investment options from which 401(k) the plan trustee selected a
smaller plan menu was not a fiduciary because provider "did not
have ultimate authority over which investments were included in
the Plans"); <u>Zang et al. v. Paychex, Inc.</u>, 728 F. Supp. 2d 261,
270 (W.D.N.Y. 2010) (holding that plan servicer which provided
401(k) plan a menu of investment options was not a fiduciary
because parties' contract required servicer to give the plan

notice of and opportunity to reject any changes to the menu).

Some courts have held that in some circumstances the authority to change investment options <u>did</u> give rise to fiduciary status. <u>See</u> <u>Charters</u>, 583 F. Supp. 2d at 199 (holding that insurer was a fiduciary to a 401(k) plan because the insurer had the ability to substitute investment options and the plan had no "meaningful opportunity to reject substitutions" because of the penalty charges associated with doing so); <u>Haddock v. Nationwide Fin. Servs.</u>, 419 F.Supp. 2d 156, 161 (D. Conn. 2006) (holding that insurance company may be a fiduciary where it expressly retained the "authority to delete and substitute mutual funds from the list of available options"). Another court has held that a plan service provider's contractual right to substitute investment options came within the broadly defined meaning of "plan administration" and it was eligible for fiduciary status under subsection (iii). <u>See</u> <u>Healthcare Strategies</u>, 961 F. Supp. 2d at 401-02.

Under the contract, MassMutual retained the final say on mutual fund substitutions for the Overall Menu. The GAC states that "all assets of MassMutual are invested by MassMutual as it, in its sole discretion, may determine, . . . including, but not limited to, the discontinuance of a Separate Investment Account." Therefore, MassMutual reserves the right to delete or substitute the mutual funds the SIA's invest in, including those that GSI

lists on its Plan Menu. The GAC does not require that MassMutual provide GSI any notice of changes or opportunity to reject them, or allow GSI to engage a different service provider in the event of a rejection. However, while MassMutual has added and subtracted funds from the Overall Menu, the only changes to GSI's Plan Menu since 2005 have been initiated at GSI's behest. There is no evidence that in fact MassMutual has exercised any authority to substitute funds on the Plan Menu or acted in any way other than in a ministerial fashion with respect to the Plan Menu.

Subsection (i) of the functional fiduciary definition does not apply because MassMutual never _exercised_ any authority to control the investment options available on the Plan Menu during the limitations period. Plaintiffs argue that MassMutual at least _possessed_ discretionary authority over the plan assets by controlling the investment of the Separate Investment Account, even if it never exercised this discretion. Even if the discretion to substitute investments on the Plan Menu falls within a broad definition of "administration" of the plan, plaintiffs' argument fails under the "to the extent" requirement. Plaintiffs have presented no evidence that MassMutual selected investment options with reasonable fees and then unilaterally substituted funds with high fees or took any non-ministerial actions in connection with this fiduciary status. The only

24

evidence is that it acted in a purely ministerial role with respect to investments on the Plan Menu.

## CONCLUSION

Because the Court concludes that MassMutual is a functional fiduciary under subsections (i) and (iii) when determines its compensation package for services provided in the SIA's, the Court needs not analyze plaintiffs' other theories for triggering fiduciary duties.

## ORDER

The Court **DENIES** Defendant's Motion for Partial Summary Judgment (Docket No. 120).


  /s/ PATTI B. SARIS
PATTI B. SARIS
United States District Judge